1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

SCOTT LAKE
NV Bar No. 15765
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 6205
Reno, NV 89513
Phone: (802) 299-7495
Email: slake@biologicaldiversity.org

*Attorney for Plaintiffs*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

WESTERN WATERSHEDS PROJECT and the CENTER FOR BIOLOGICAL DIVERSITY,

    Plaintiffs,

vs.

U.S. DEPARTMENT OF THE INTERIOR, BUREAU OF LAND MANAGEMENT, JARED BYBEE in his official capacity as Field Manager of the Bureau of Land Management Bristlecone Field Office, and SHIRLEY JOHNSON in her official capacity as Field Manager of the Bureau of Land Management Caliente Field office,

    Defendants.

Case No: 2:23-cv-435

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1

**INTRODUCTION**

1.      This action challenges the South Spring Valley and Hamlin Valley Watershed Restoration Plan Decision Record (the Decision), signed by Bristlecone Field Office Manager Jared Bybee and Caliente Field Office Manager Shirley Johnson on September 28, 2022, and the associated Final Environmental Assessment (EA) and Finding of No Significant Impact (FONSI). Plaintiffs bring this case under the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332, the Federal Land Policy and Management Act (FLPMA), 43 U.S.C. § 1701-1787, and the Administrative Procedure Act (APA), 5 U.S.C. § 706.

2.      South Spring and Hamlin Valleys are located in far-eastern Nevada near Great Basin National Park. Both valleys contain vast areas of federal public land, managed by Defendant Bureau of Land Management (BLM) under a federal statutory mandate to "protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values." 43 U.S.C. §1701(a)(8). Public lands in South Spring and Hamlin Valleys provide habitat for a wide variety of wildlife species, including the imperiled greater sage-grouse and pinyon jay. BLM itself has identified sagebrush shrublands in South Spring and Hamlin Valleys as having "the highest habitat value for maintaining sustainable [sage-grouse] populations." South Spring and Hamlin Valleys also host millennia-old pinyon and juniper forests, including a grove of Utah juniper on the floor of Spring Valley known as *Bahsawahbee*, or the "Swamp Cedars," which is sacred to the area's original inhabitants, the Western Shoshone.

3.      Although labeled a "Restoration Plan," BLM's September 28, 2022 Decision is in reality a prescription for widespread deforestation and sagebrush eradication over a 384,414-acre area encompassing nearly all of the federal public land in South Spring and Hamlin Valleys. Specifically, the plan calls for the following:

> a.      "Chaining"—dragging an anchor chain from a U.S. Navy vessel (with 40- to 120-pound links and 18-inch-long railroad irons welded perpendicular to the links) between two bulldozers in order to uproot and crush pinyon-juniper forests and sagebrush;

b. "Dixie Harrow"—a large spike-tooth harrow (a heavy frame set with teeth or tines) pulled cross-country by a four-wheel drive tractor in order to kill shrubs;

c. "Roller Chopper"— a large steel cylindrical drum, equipped with several blades protruding 12-14 inches along the entire width, which is towed behind a crawler-type tractor to crush and chop sagebrush and other mature vegetation;

d. "Mowing"— a mowing deck pulled behind a tractor which, according to BLM, would reduce vegetation height to between "ground level to 12-15 inches high," resulting in 40 to 100% sagebrush mortality;

e. "Mastication"— the cutting, chopping and sometimes chipping of pinyon pine and juniper trees using light- to heavy-duty logging equipment;

f. "Hand Treatment"—clearcutting or selective cutting of pinyon and juniper trees with chainsaws;

g. Prescribed fire—intentionally ignited wildland fires designed to kill pinyon-juniper forests, sagebrush, and other forest, woodland and/or shrub vegetation types; and

h. "Chemical Treatments"—application of any one, or any combination of, the dozens of chemical herbicides discussed in BLM's 2007 "Programmatic Environmental Impact Statement for Vegetation Treatments Using Herbicides on BLM Lands in 17 Western States."

4.      BLM's EA states that any of these so-called "treatments" could occur anywhere within the 384,414-acre project area, and that some areas may be subject to multiple "treatments" (e.g., hand-cutting of pinyon-juniper combined with Dixie Harrow to eliminate sagebrush and herbicide application).

5.      BLM's Decision approving these so-called "treatments" and the associated EA use an approach that has been soundly rejected by the courts—they fail to specify where each of these activities will occur, and do not provide any site- or species-specific information about the affected environment. Consequently, they fail to adequately describe the project's direct, indirect, and

cumulative impacts on the human environment, as required under NEPA, and do not provide a sufficient basis for informed decisionmaking and informed public participation. 42 U.S.C. § 4332.

6.     Under FLPMA, BLM must comply with the Ely District Approved Resource Management Plan (Ely RMP). The Ely RMP imposes specific requirements on BLM when authorizing vegetation management projects. Specifically, BLM must consider the habitat needs of certain sensitive wildlife species, such as the pinyon jay and tree-roosting bats, and appropriately mitigate any habitat losses. But the EA provides no information on where the various "treatments" discussed above would occur, or how particular species' habitats would be impacted, making such consideration impossible. And the Decision fails to provide for mitigation of any habitat losses for these species. Consequently, BLM's Decision and EA violate the Ely RMP and FLPMA. 43 U.S.C. § 1712.

7.     Plaintiffs Western Watersheds Project (Western Watersheds) and the Center for Biological Diversity (the Center) seek remand and vacatur of this decision and the associated environmental analysis, as well as declaratory and/or injunctive relief requiring BLM to comply with NEPA and FLPMA.

## JURISDICTION AND VENUE

8.     Jurisdiction is proper in this Court under 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1346 (United States as defendant), and 5 U.S.C. §§ 551-706 (Administrative Procedure Act), because this action involves the United States as a defendant and arises under the laws of the United States, including NEPA, 42 U.S.C. § 4332, FLPMA, 43 U.S.C. §§ 1701-1736, 1737-1782, and the APA, 5 U.S.C. §§ 551-706. An actual justiciable controversy exists between Plaintiffs and Defendants. The requested relief is proper under 28 U.S.C. §§ 2201 and 2202 (Declaratory Judgment Act) and 5 U.S.C. §§ 705 and 706 (Administrative Procedure Act). The challenged agency actions are final and subject to this Court's review under 5 U.S.C. §§ 702, 704, and 706 (Administrative Procedure Act).

9.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because Defendants have offices in this judicial district, a substantial part of the events or omissions giving rise to the

claims in this Complaint occurred in this judicial district, and the lands involved in this case are located in this judicial district.

10.     Venue is proper in the Southern Division of this District, as the challenge involves federal lands and resources in Lincoln and White Pine Counties. L.R. 1A 1-6.

11.     Western Watersheds and the Center timely appealed the Decision, EA and FONSI to the Interior Board of Land Appeals (IBLA) and sought to stay implementation of the Decision. IBLA denied the request for a stay, and Western Watersheds and the Center dismissed their administrative appeal. Plaintiffs have thus exhausted all required administrative remedies.

## PARTIES

12.     Western Watersheds is a non-profit organization with more than 12,000 members and supporters whose mission is to protect and restore western watersheds and wildlife through education, public policy initiatives, and legal advocacy. Based in neighboring Idaho, Western Watersheds has longstanding interests in public land management in Nevada. Western Watersheds and its staff and members use and enjoy the public lands and their wildlife, cultural, and natural resources for health, recreational, scientific, spiritual, educational, aesthetic, and other purposes, including in Nevada. Western Watersheds also has a direct interest in natural resource management projects that occur in areas with sensitive wildlife populations and important wildlife habitat, such as greater sage-grouse and designated sage-grouse habitat management areas.

13.     The Center is a non-profit corporation headquartered in Tucson, Arizona, with offices and staff in several states including Nevada. The Center works through science, law, and policy to secure a future for all species, great or small, hovering on the brink of extinction. The Center is actively involved in endangered species and habitat protection nationwide, and has more than 89,000 members throughout the United States and the world, including 700 members in Nevada.

14.     Western Watersheds and the Center bring this action on their own behalf, and on behalf of their members, whose diverse interests span natural history, ecology, conservation, wildlife and native plant observation, nature photography, hiking, camping, backpacking, quiet

and solitude in nature, dark skies, spiritual renewal, and a love of Nevada's natural landscapes, and who enjoy and use federal public land in Nevada, including lands administered by BLM in South Spring and Hamlin Valleys, as places to pursue these activities now and into the future.

15.     For example, Western Watersheds and Center member Patrick Donnelly regularly visits Spring Valley to survey for rare plants, view wildlife, take photographs, and enjoy the remote, rugged, and undisturbed character of the area. Mr. Donnelly has also visited Hamlin Valley to survey for rare plants, and intends to return to both Spring Valley and Hamlin Valley continue these surveys in Spring of 2023. The area's importance to Mr. Donnelly cannot be understated; he calls Spring Valley "one of the centers of [his] universe in the Great Basin" and "one of the most special places in the whole world."

16.     Western Watersheds Conservation Advocate and member Paul Ruprecht has visited Spring Valley and Hamlin valley several times to hike, camp, take photographs, observe scenery including sagebrush shrublands and pinyon-juniper forests, and observe wildlife associated with these habitats. Mr. Ruprecht last visited South Spring and Hamlin Valleys in May 2021, and plans to return to the area in May or June of 2023. During his visits, Mr. Ruprecht enjoys viewing and photographing species such as sage-grouse, pinyon jay, Clark's nutcracker, mule deer, elk, and other species which require or prefer pinyon juniper woodlands and sagebrush shrublands.

17.     Center members Rick and Delaine Spilsbury are members of the Western Shoshone Tribe who live within their ancestral homelands near Ely, Nevada and frequently visit Spring Valley. Both have visited Spring Valley more times than they can count in order to hike, camp, hunt, cycle, seek spiritual renewal, and connect with their Western Shoshone heritage. Spring Valley contains a sacred site of great historical and spiritual significance to the Western Shoshone. Known in the Shoshone language as *Bahsawahbee*, it is a unique grove of Utah juniper on the floor of Spring Valley, and the site of three massacres of Western Shoshone people by the U.S. military. The Spilsburys often visit the site to connect with and honor their ancestors, and are currently working to secure protected status for the site at both the state and federal levels.

18.     Mr. Donnelly is injured by BLM's Decision because, if the project were to move forward as approved, "over one hundred thousand acres of beautiful Spring and Hamlin Valleys would be decimated by bulldozers dragging chains, masticators destroying forest, and mowers ripping up valuable sagebrush habitat." Mr. Donnelly states that he "would no longer be able to enjoy a pristine and undeveloped landscape"; he would "no longer . . . be able to view wildlife and biodiversity in its undisturbed state"; he would "no longer be able to seek spiritual renewal and quiet contemplation there"; and he would "be harmed by the knowledge that one of the most special places in the world to me was now the site of unimaginable destruction and deforestation."

19.     Mr. Ruprecht is injured by BLM's Decision because it will negatively impact the species and landscapes he enjoys viewing and photographing. Mr. Ruprecht has personally observed the results of BLM vegetation removal treatments in other, ecologically similar areas, and found that these areas are abandoned by wildlife and often do not recover into healthy or functional habitat. A similar outcome in Spring and Hamlin Valleys would irreparably injure Mr. Ruprecht's enjoyment of Spring and Hamlin Valleys, their scenery, and their wildlife. Mr. Ruprecht is further injured by BLM's failure to appropriately manage livestock grazing in the Project area, which has degraded many of the habitats that Mr. Ruprecht has visited, and would likely inhibit recovery if the Project were to go forward. Mr. Ruprecht reports that in some heavily grazed areas within Spring and Hamlin Valleys have been "essentially reduced to dirt over huge expanses."

20.     The approved tree- and shrub-removal activities would also irreparably harm the Spilsburys' experience of visiting their ancestral homelands in Spring Valley and the *Bahsawahbee* sacred site. To the Spilsburys, pinyon and juniper woodlands are themselves sacred, having helped sustain their ancestors in the Great Basin for tens of thousands of years. Additionally, the pinyon and juniper woodlands and sagebrush shrublands in Spring and Hamlin valleys are a part of a natural, unaltered landscape that the Spilsburys value and frequently enjoy. Removing these woodlands and shrublands would harm the Spilsburys personally, spiritually, aesthetically, and professionally. As Delaine Spilsbury explains, the ongoing destruction of pinyon

and juniper trees on BLM lands in eastern Nevada, including in Spring and Hamlin valleys, connects with a deeply felt tragic and traumatic history for her people:

> I see the destruction of pinyon and juniper forests in the Great Basin as theft of our Native spirituality and heritage. When will the U.S. Government stop stealing from us former inhabitants of this great land of ours? There is almost nothing left to take. It would severely and irreparably harm me to see the pinyon-juniper forests and sagebrush in Spring Valley destroyed on my next visit to the area. It would be like seeing a cemetery desecrated or destroyed.

21.     The Spilsburys, Mr. Donnelly, Mr. Ruprecht and other members of Western Watersheds and the Center have been and will continue to be adversely affected and irreparably injured if Defendants' ongoing violations of NEPA, FLPMA, and the APA continue. These are actual, concrete injuries caused by the Defendants' violations of the NEPA, FLPMA, and the APA. The relief sought will redress these injuries to Western Watersheds, the Center, and their members.

22.     Defendants' failure to comply with NEPA additionally harms Western Watersheds, the Center, and their members by denying them the right to informed decisionmaking and full disclosure under NEPA, as well as the right to meaningfully participate in the decisionmaking process.

23.     Defendant U.S. Department of the Interior ("Interior") is a cabinet-level executive agency responsible for, among other things, managing federally-owned lands, wildlife, and public natural resources throughout the United States. Interior has the ultimate responsibility to administer and implement FLPMA, and to comply with all other applicable federal laws, including NEPA.

24.     Defendant Bureau of Land Management is an agency within the U.S. Department of the Interior. BLM and its officers are responsible for administering federally-owned public lands and natural resources, under all federal laws applicable thereto, including NEPA and FLPMA.

25.     Defendant Jared Bybee is the Field Office Manager for BLM's Bristlecone Field Office. As Field Office Manager, Mr. Bybee is responsible for administering and managing public lands and resources within the Bristlecone Field Office, including lands and resources located in

South Spring and Hamlin Valleys. Mr. Bybee co-signed the September 28, 2021 Decision and FONSI authorizing the project. Mr. Bybee is sued in his official capacity.

26.    Defendant Shirley Johnson is the Field Office Manager for BLM's Caliente Field Office. As Field Office Manager, Ms. Johnson is responsible for administering and managing public lands and resources within the Caliente Field Office, including lands and resources located in South Spring and Hamlin Valleys. Ms. Johnson co-signed the September 28, 2021 Decision and FONSI authorizing the project. Ms. Johnson is sued in her official capacity.

## LEGAL BACKGROUND

### A. The National Environmental Policy Act (NEPA)

27.    NEPA is "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a) (2019). In passing NEPA, Congress "recogniz[ed] the profound impact of man's activity on the interrelations of all components of the natural environment" and set out "to create and maintain conditions under which man and nature can exist in productive harmony." 42 U.S.C. § 4331(a).

28.    NEPA serves twin goals. First, it aims to ensure that federal agencies carefully consider detailed information regarding the environmental impact of a proposed action before reaching a decision on the action. Second, it ensures that information about a proposal's environmental impact is made available to members of the public so that they may play a role in the decision-making process. NEPA ensures that important effects will not be overlooked or underestimated, only to be discovered after resources have been committed or the die is otherwise already cast.

29.    The White House Council on Environmental Quality (CEQ) has promulgated regulations implementing NEPA. *See* 40 C.F.R. § 1507.3(b) (1978). On July 16, 2020, CEQ published a Final Rule significantly revising these regulations. 85 Fed. Reg. 43304-76 (July 16, 2020). The Final Rule took effect on September 14, 2020, and applied to federal projects beginning after September 14, 2020. *Id.* at 43372-73. The NEPA process for the South Spring Valley and Hamlin Valley Watershed Restoration Plan began well before September 14, 2020, and BLM

applied the pre-2020 regulations to the project. Accordingly, the regulations in effect before the promulgation of CEQ's July 16, 2020 Final Rule apply and are cited throughout this Complaint.

30.     NEPA and its implementing regulations require federal agencies to prepare an environmental impact statement (EIS) for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C)(i); 40 C.F.R. § 1501.4 (2019). An agency may first prepare an environmental assessment (EA) to determine whether an EIS is necessary. 40 C.F.R. §§ 1501.4, 1508.9 (2019). If, after preparing an EA, the agency decides that an EIS is not necessary, the agency must prepare an explanatory finding of no significant impact (FONSI) which "briefly present[s] the reasons why an action . . . will not have a significant effect on the human environment." 40 C.F.R. § 1508.13 (2019).

31.     Whether the agency prepares an EA or an EIS, the agency must take a "hard look" at all direct, indirect, and cumulative environmental impacts of the proposed action and reasonable alternatives thereto. 40 C.F.R. §§ 1502.14, 1502.16 (2019). To fulfill its purpose, the agency's environmental analysis must "provide full and fair discussion of significant environmental impacts and . . . inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1 (2019).

32.     A "hard look" under NEPA requires a thoughtful and probing analysis of the possible impacts associated with the proposed project. General statements about "possible" effects and "some risk" do not constitute a "hard look" absent a justification regarding why more definitive information could not be provided. Without quantified, detailed information, BLM cannot adequately assess the project's environmental impacts, and cannot comply with NEPA. The agency may not simply rely on its staff's opinions without hard data; it must explain the conclusions it has drawn from its chosen methodology, and the reasons it considered the underlying evidence to be reliable.

33.     An EA or EIS must also consider a project's cumulative impacts. A cumulative impact is "the impact on the environment which results from the incremental impact of the action

when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other action." 40 C.F.R. § 1508.7 (2019). "Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." *Id.* A cumulative impacts analysis must be more than perfunctory; it must provide a useful analysis of the cumulative impacts of past, present, and future projects. To be useful to decision makers and the public, the cumulative impacts analysis must include some quantified or detailed information.

34.    NEPA permits an agency to predict broad cumulative impacts of related actions in a programmatic NEPA document before it knows the actual direct and indirect effects of implementation decisions on specific project areas. *See* 40 C.F.R. § 1508.28 (2019). However, once the site-specific effects of a proposed action become reasonably foreseeable, an agency must analyze the direct and indirect effects of the proposed action. Where an agency seeks to authorize site-specific actions through a single EIS or EA—that is, where the broad-scale analysis represents the agency's "last word" on environmental impacts before ground-level implementation—the required level of analysis is stringent. At a project's "implementation stage," NEPA review must be more tailored and detailed because the agency is confronting individual, site-specific actions and impacts.

**B.  The Federal Land Policy and Management Act (FLPMA)**

35.    FLPMA is the "organic act" of BLM and governs the agency's management of public lands and resources. In FLPMA, Congress declared that is the policy of the United States to manage the public lands "in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values" and that, "where appropriate, will preserve and protect certain public lands in their natural condition." 43 U.S.C. § 1701(a)(8).

36.    FLPMA provides that BLM "shall manage the public lands . . . in accordance with the land use plans developed . . . under section 1712 of this title." 43 U.S.C. § 1732(a). "All . . . resource management authorizations and actions" must "conform to the approved plan." 43 C.F.R.

§§ 1610.5-3(a). If a proposed action is not consistent with the applicable land use plan, BLM must deny the proposed action or propose and adopt an amendment to the plan. 43 C.F.R. §§ 1610.5-3, 1610.5-5.

37.     The approved land use plan applicable to this Project is the Ely RMP, as modified by the Nevada Greater Sage-Grouse Resource Management Plan Amendment. The Ely RMP contains two requirements specifically applicable to this Project regarding impacts to special-status species. First, BLM must "[m]itigate all discretionary permitted activities that result in the loss of special status species habitats on a ratio of 2 acres of comparable habitat for every 1 acre of lost habitat as determined on a project-by-project basis." Second, BLM must "consider the habitat needs of obligate bat species in restoration treatments."

## C. The Administrative Procedure Act (APA)

38.     The APA provides for judicial review of federal agency actions for persons adversely affected or aggrieved by the agency action. 5 U.S.C. § 702. Agency action made reviewable by statute and final agency action for which there is no other adequate remedy are subject to judicial review. *Id.* § 704.

39.     The APA requires a reviewing court to "compel agency action unlawfully withheld or unreasonably delayed" and "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706

40.     An agency action is arbitrary and capricious if the agency relied on factors which Congress did not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

## FACTUAL BACKGROUND

41.     The Project authorizes several different methods of deforestation and shrub destruction across a vast area of federal public land in eastern Nevada, and specifically targets the

habitat of imperiled wildlife species such as the greater sage-grouse and pinyon jay. Current federal policy emphasizes the conservation of these species and their habitats. However, because BLM evaluated the Project at the most general scale, it failed to provide any meaningful analysis of the Project's impacts to these specific species or their habitats. BLM also failed to evaluate the Project's site-specific impacts on other highly important public resources, including wilderness characteristics. And BLM failed to consider the cumulative impacts of BLM-authorized livestock grazing—a widespread and significant land use has been shown to directly impact BLM's stated objectives for the Project. BLM's failure to look before leaping violates both NEPA and FLPMA.

**A. The Greater Sage-Grouse and its Habitat**

42.    The greater sage-grouse (*Centrocercus urophasianus*) is the largest grouse species found in North America. Sage-grouse are ground-dwelling birds, and because they depend upon sagebrush for food, shelter, and hiding cover throughout their lifecycle, they are considered "sagebrush obligates." Greater sage-grouse are known for their elaborate courtship displays, which take place on breeding grounds called "leks."

43.    Sage-grouse populations have been in decline since the 1960s due to the destruction and degradation of their sagebrush habitat. Average population declines across the range of the species are estimated at 2% per year from 1965 to 2015, or a total of 66% over that same time period. More recently, a study by the U.S. Geological Survey concluded that sage-grouse populations have plummeted by 80% since 1965. Half of that decline has happened since 2002. Declines have been especially severe in the Great Basin, where the primary sage-grouse conservation strategy has relied on treatments like those proposed here.

44.    Sage-grouse exhibit strong site fidelity (loyalty to a particular area) to seasonal habitats (i.e., breeding, nesting, and wintering areas). Adult sage-grouse rarely switch from these habitats once they have been selected, limiting their ability to adapt to habitat degradation and other changes in their local environments.

45.    On March 23, 2010, the U.S. Fish and Wildlife Service (the Service) determined that protecting the greater sage-grouse under the Endangered Species Act was "warranted" due to

persistent, range-wide population declines, but the Service refused to do so at that time, finding it precluded by other priorities. 75 Fed. Reg. 13910 (March 23, 2010).

46.   In its 2010 "warranted" finding, FWS attributed the sage-grouse's decline primarily to the degradation and fragmentation of sagebrush habitats. FWS found that human activities, including agriculture, urbanization, infrastructure expansion, livestock grazing, recreation, and energy development had significantly degraded and destroyed sagebrush habitats across the West, and posed a continuing threat to the greater sage-grouse's persistence. FWS stated:

> Past and current human influences on sagebrush-steppe ecosystems (particularly livestock grazing, fire, and recreation) are not perpetuating the original plant communities. West (1999) estimates that *less than 1 percent of the sagebrush-steppe remains in unaltered condition*. Furthermore, systematic disturbance has caused significant, and sometimes radical, changes in species composition in many areas. (emphasis added).

47.   In the Great Basin portion of the species' range, which encompasses the Project area, FWS emphasized the threats posed by interactions between human disturbance, wildfire, and invasive species. FWS identified a cycle of habitat degradation in which human activities such as livestock grazing, recreation, mining, and energy development produce ground disturbance, which encourages the invasion of highly flammable non-native annual grasses, which in turn contribute to unnaturally frequent and severe wildfires. Invasive exotic grasses such as cheatgrass (*Bromus tectorum*) readily invade sagebrush habitats, particularly after these areas have been disturbed by development, grazing, or the kinds of vegetation-removal treatments BLM has authorized here. Once established, invasive grasses provide abundant and continuous fuel for wildfires, thus increasing both wildfire risk and frequency. While sagebrush killed by fire are extremely slow to reestablish, cheatgrass recovers quicky, often within one to two years of a fire event. Consequently, the invasion of cheatgrass and other invasive annual grass species ultimately leads to a reoccurring "cheatgrass-fire" cycle that prevents sagebrush reestablishment and permanently eliminates sage-grouse habitat.

48.   In addition to land-use practices, invasive species, and fire, FWS's 2010 "warranted" finding acknowledged adverse impacts from BLM vegetation-management practices:

In addition to wildfire, land managers are using prescribed fire as well as mechanical and chemical treatments to obtain desired management objectives for a variety of wildlife species and domestic ungulates in sagebrush habitats throughout the range of the greater sage-grouse. *While the efficacy of treatments in sagebrush habitats to enhance sage-grouse populations is questionable, as with wildland fire, an immediate and potentially long-term result is the loss of habitat* (emphasis added).

49.     The Service recognized that vegetation-removal projects—which were originally implemented in order to increase grass cover and forage for domestic livestock—have historically been widespread throughout the sage-grouse's range:

Extensive rangeland treatment has been conducted by federal agencies and private landowners to improve conditions for livestock in the sagebrush-steppe region. By the 1970s, over 2 million ha (5 million ac) of sagebrush are estimated to have been mechanically treated, sprayed with herbicide, or burned in an effort to remove sagebrush and increase herbaceous forage and grasses. The BLM treated over 1,800,000 ha (4,447,897 ac) from 1940 to 1994, with 62 percent of the treatment occurring during the 1960s. Braun (1998, p. 146) concluded that, since European settlement of western North America, all sagebrush habitats used by greater sage-grouse have been treated in some way to reduce shrub cover. The use of chemicals to control sagebrush was initiated in the 1940s and intensified in the 1960s and early 1970s. Crawford et al. (2004, p. 12) hypothesized that reductions in sage-grouse habitat quality (and possibly sage-grouse numbers) in the 1970s may have been associated with extensive rangeland treatments to increase forage for domestic livestock.

50.     Although the Service acknowledged research suggesting that mechanical treatments may be beneficial to sage-grouse "if carefully designed and executed," it cautioned that "[m]echanical treatments in blocks greater than [247 acres], or of any size seeded with exotic grasses, degrade sage-grouse habitat by altering the structure and composition of the vegetative community." The Service was particularly skeptical regarding using prescribed fires to benefit sage-grouse, concluding that the "preponderance of evidence . . . suggests [that] these treatments are not beneficial to sage-grouse."

51.     The Service further acknowledged the historical and ongoing impacts to sagebrush habitats from domestic livestock grazing. Prior to the arrival of Euro-American settlers in the 1800s, large herbivores did not exist in significant numbers in the Great Basin, with many species having gone extinct 10,000 to 12,000 years ago. From that period up until settlement, many areas

of sagebrush did not support herds of large ungulates, and grazing pressure by native species such as pronghorn, bighorn sheep, and mule deer was likely sporadic and localized. Sagebrush thus evolved without significant grazing pressure, and most plant species within the sagebrush ecosystem are not adapted to heavy or persistent grazing.

52.     Grazing can alter and degrade sagebrush habitats in numerous ways. Livestock affect soils, vegetation, water, and nutrient availability by consuming or altering vegetation, redistributing nutrients and plant seeds, trampling soils and vegetation, and disturbing biological soil crusts. Put succinctly, livestock alter both the physical composition of sage-grouse habitats, as well as the ecological processes that sage-grouse depend upon for their survival. Among other impacts, livestock remove vegetation that sage-grouse depend on to conceal themselves from predators, and create conditions that facilitate the invasion of sagebrush habitats by exotic annual grasses such as cheatgrass. Additional direct impacts from livestock include trampling, as well as fencing and infrastructure installed to facilitate grazing, which fragment sage-grouse habitat and pose a collision-mortality hazard. Despite these impacts, grazing remains the most widespread use of sagebrush habitats on BLM public lands. Grazing is authorized on nearly all of the sage-grouse habitat in the Great Basin.

53.     Once sagebrush habitats have been degraded by invasive species, wildfire, mechanical treatment, grazing or other causes, they are exceedingly difficult to restore. Restoration and rehabilitation techniques for sagebrush habitats are considered to be mostly unproven and experimental. Restoration success also depends on uncontrollable factors, such as precipitation. And even assuming complete success of restoration efforts on targeted areas, it may still take decades for a shrub-dominated vegetation community to return. Landscape restoration may require centuries, and even longer periods may be required for greater sage-grouse to use recovered or restored landscapes. Consequently, sage-grouse conservation efforts have mainly focused on preserving, protecting, and enhancing areas which currently provide functional sage-grouse habitat. The Service, other federal agencies, and academic experts have all warned against conducting treatments that remove sagebrush cover within sage-grouse habitat.

54.     After identifying these various threats to the greater sage-grouse and its sagebrush habitat, the Service's 2010 "warranted" finding explained that existing local, State, and Federal regulatory mechanisms were not sufficient to address these threats or protect the species from eventual extinction. The Service identified the BLM's resource management plans (RMPs) as the primary regulatory mechanisms applicable to sage-grouse on federal public lands.

55.     The widespread degradation of sagebrush ecosystems across the West has affected other sagebrush-obligate species as well. For example, the pygmy rabbit (*Brachylagus idahoensis*), a BLM-designated "sensitive" species, is found primarily on big-sagebrush-dominated plains and valley bottoms where sagebrush occurs in tall, dense clumps. Pygmy rabbits require dense stands of sagebrush and prefer sites with greater shrub cover and height. As with the greater sage-grouse, pygmy rabbits depend on sagebrush for both cover and food. Sagebrush may comprise up to 99 percent of a pygmy rabbit's diet in winter and 51 percent in summer. Pygmy rabbit dispersal may be limited by open (sagebrush-free) areas, roads, and fences. Put simply, Sagebrush cover is critical to pygmy rabbits and sagebrush eradication is detrimental. The overall decline in sagebrush habitat throughout the Great Basin is likely the most significant factor contributing to pygmy rabbit population declines in this region.

56.     Pygmy rabbits, like sage-grouse, have been adversely impacted by habitat fragmentation, wildfire, invasive species, infrastructure development, and livestock grazing, with an overall population decline of 10 to 50 percent from historic levels. Due to continuing declines in both population and suitable habitat, pygmy rabbits were recently petitioned for listing under the Endangered Species Act. The listing petition reports that an "alarming amount of pygmy rabbit habitat . . . has been lost, degraded and/or fragmented in recent decades," and that the species is at risk even in so-called "stronghold" areas. The Service has yet to make a determination on the petition to list the pygmy rabbit.

**B.  The Pinyon Jay and its Habitat**

57.     Pinyon and juniper forests are ecologically rich areas that provide habitat for hundreds of plant and animal species. Game species such as elk, mule deer, and wild turkey are

year-round residents in pinyon-juniper woodlands and depend on this habitat for food and cover. Pinyon-juniper woodlands also make significant contributions to carbon sequestration, and thus help mitigate the impacts of global climate change.

58.    Pinyon-juniper woodlands support a high diversity of birds, some of which depend exclusively on these woodlands. The pinyon jay (*Gymnorhinus cyanocephalus*)—a medium-sized, blue, crestless bird species found throughout the western United States—is a pinyon-juniper obligate.

59.    Due in part to loss and degradation of its obligate pinyon-juniper habitat, the pinyon jay is declining at an alarming rate. Over the last 50 years, the species has declined by an estimated 80%, faster than the greater sage-grouse. BLM has designated the pinyon jay as a "sensitive" species.

60.    The continuing loss of pinyon-juniper woodlands poses a significant threat to the pinyon jay. As a pinyon-juniper obligate species, the pinyon jay cannot survive without pinyon-juniper woodlands. Since the 1800s, millions of acres of pinyon-juniper woodlands have been deliberately destroyed across the West. Despite the well documented importance of pinyon-juniper woodlands to not only the pinyon jay but numerous other species, land managers continue to remove extensive amounts of pinyon and juniper in the name of wildfire risk reduction and habitat restoration for other species, including, ironically, greater sage-grouse.

61.    The International Union for the Conservation of Nature (IUCN) has assessed the pinyon jay as "vulnerable" to extinction, and linked its decline to conversion and degradation of pinyon-juniper woodland habitat. IUCN has specifically identified pinyon-juniper eradication efforts by federal land managers as contributing to the decline of pinyon-juniper habitat across the pinyon jay's range:

> [O]ngoing forest loss within the species's range is currently estimated at ~5.6% per three generations. Land managers have followed a policy to eradicate this woodland, with the U.S. Forest Service classifying it as "noncommercial" and placing it in a "no-value" category. . . . Piñon-juniper woodland is also often removed to create or promote shrublands for the benefit of sage-grouse, a species targeted for conservation efforts, despite its rates of decline being slower than those

of [the pinyon jay], which declines as a result. Currently herbicides, mechanical ploughing and fire are used to turn piñon-juniper woodland into pasture land for cattle.

62.     Pinyon and juniper forests have been widespread in the Great Basin for thousands of years. The distribution and composition of these forests has shifted over time in response to climactic conditions, a process that continues today. And as a result of global climate change, pinyon and juniper forests are experiencing significant mortality, which will further affect their distributions. Climate change has been linked to reductions in pinyon and juniper cover, which in turn exacerbate the effect of human destruction of pinyon jay habitat.

63.     Human activities since the mid-1800s have had a tremendous impact on pinyon and juniper forests. Early Euro-American settlers depended on local sources of wood for both fuel and construction. Historically, large numbers of trees were cut to make fences. Pinyon and juniper were also an important source of wood for mining operations, which used pinyon and juniper trees for mine supports, buildings, and fuel for smelters and kilns. Throughout the late 1880s, mining communities consumed enormous quantities of local pinyon and juniper. For example, the Comstock mines in western Nevada consumed 18 million board feet of timber annually, while mines in Eureka, Nevada used 17,850 bushels of charcoal per day. By about 1870, forests had been depleted for a distance of 50 miles around Eureka, and to similar extents around other communities including Cedar City, Utah.

64.     Subsequent deforestation occurred as pinyon-juniper woodlands were removed, or "treated," by federal range managers. Historical treatments used many of the same methods proposed here, including burning and chaining. Accurate records of these early projects are not available, but estimates indicate that roughly three million acres of woodland were removed and converted to livestock forage between 1960 and 1972 alone. As BLM's EA for the Project acknowledges, many of the treated sites remain in poor condition today.

65.     Currently, federal land management agencies, including BLM, follow a policy of pinyon-juniper reduction and eradication, often with the stated purpose of improving habitat for species of conservation concern or economic importance, such as sage-grouse and mule deer. As

the Service acknowledged in 2015, evidence for the effectiveness of this policy as a sage-grouse conservation method is lacking. While researchers have found that targeted removal of lower-density pinyon-juniper trees during the early phases of woodland expansion can benefit sage-grouse nesting success where adequate shrub and grass cover are present, there is scant scientific support for the widespread removal of pinyon and juniper forests, particularly where those forests are well-established or lack a shrub/grass understory. Nevertheless, both BLM and the U.S. Forest Service continue to remove pinyon-juniper forests across the West, often with little consideration of how these actions affect the pinyon jay and other pinyon-juniper obligate species.

66.     Researchers are just beginning to understand effects of land management actions on pinyon jays and their habitats. Current resources on the topic, such as the Conservation Strategy for the Pinyon Jay, produced in collaboration with the Service, recommend against treating (thinning, burning, herbicide application, etc.) pinyon-juniper woodlands at pinyon jay nesting colony sites and foraging areas within the home ranges of pinyon jay flocks. Knowledge of individual pinyon jay flocks, their home ranges, and habitats is thus necessary for designing effective site-specific management and mitigation actions.

67.     Like sagebrush habitats, pinyon-juniper forests are vulnerable to the "cheatgrass-fire" cycle, particularly in arid locations. Prior to Euro-American settlement, fire in pinyon and juniper communities was thought to be rare in general, and fire cycle in persistent pinyon-juniper communities were likely hundreds or even thousands of years. When fire does occur in pinyon and juniper woodlands it is typically high-intensity and stand-replacing—meaning it completely eliminates tree cover. With the introduction of annual invasive grasses such as cheatgrass, fire rotations in pinyon-juniper woodlands can shorten dramatically, limiting the forests' ability to recover.

68.     Pinyon and juniper removal treatments are frequently proposed with the purpose of reducing wildfire risk or returning the landscape to a purported "natural" condition. But because these woodlands never experienced frequent fire, treatments that aim to reduce fire rotations do not restore natural conditions in these ecosystems.

69.     Although targeted removal of pinyon and juniper, under certain conditions, may benefit species that favor sagebrush or grasslands, both pinyon-juniper and sagebrush removal projects can have significant adverse, unintended consequences. Paradoxically, projects designed to reduce wildfire can end up increasing wildfire risk by increasing grass growth, particularly invasive, non-native annuals like cheatgrass. While projects often aim to increase herbaceous plant growth (grasses and forbs), these "desired" species also create continuous ground-level fuel loads that are easily ignited and contribute to larger, more frequent, and more intense fires. Many areas in the Great Basin that have been treated in the past 50 years are now infested with non-native cheatgrass or introduced forage grasses such as crested wheatgrass.

70.     Because of its significant decline and the various threats to its long-term persistence, including the continuing removal of pinyon and juniper forests across the West, the pinyon jay was recently petitioned for listing under the Endangered Species Act. The Service has yet to make a determination on the petition to list the pinyon jay.

71.     Pinyon and juniper forests also hold cultural, spiritual, and historical significance for the region's Native American tribes. Native Americans have used pinyon pine and juniper trees for food, medicine, and ceremonial purposes since time immemorial. Pinyon pine nuts are a traditional food source for area tribes and a focal point of traditional ways of life. Tribes and their members today maintain ties to historical pine-nut gathering locations, and hold ceremonies to coincide with the annual pine nut harvest. Tribal elders still participate in pine nut collecting activities, though the removal of trees from low-elevation sites by federal land managers makes such participation more difficult, and in some cases impossible.

**C. The Ely RMP**

72.     BLM's Ely District Office manages approximately 11.5 million acres of public lands within central Nevada. The public lands managed by the Ely District Office measures approximately 230 miles (north-south) by 115 miles (east-west) in east/central Nevada, and encompass South Spring and Hamlin Valleys.

73.    The northern two-thirds of the Ely District, which lies within the Great Basin ecological system, historically featured sagebrush habitat, while the southern third lies in the more arid Mojave ecological region. Sagebrush habitat in the Ely District once supported abundant sage-grouse populations. The Ely District also historically supported large expanses of pinyon-juniper woodland.

74.    However, after a century of excessive livestock grazing as well as construction of roads, fences, powerlines, and other infrastructure, and because of effects of cheatgrass and other non-native plant invasions, fires, drought, and other pressures, much sagebrush habitat in the Ely District has been lost, and remaining sagebrush stands are now seriously degraded and fragmented. As a result, sage-grouse populations along with other sagebrush-obligate species, including pygmy rabbit, have suffered and continue to decline.

75.    BLM began the process of revising the Ely RMP and released a draft EIS for the revised RMP in July 2005 for public comment. BLM issued a Final Environmental Impact Statement (EIS) for the revised Ely RMP in November 2007, and approved a Record of Decision (ROD) adopting the final revised Ely RMP in August 2008.

76.    The ROD for the 2008 Ely RMP expressly states that it is a programmatic document designed to "guide decisionmaking for future site-specific actions," and specifies the implementation of the plan will require "preparation of detailed, project-level NEPA analysis prior to on-the-ground implementation."

77.    Accordingly, the environmental analysis in the EIS for the Ely RMP is programmatic in nature, and contemplates that future, project-level analysis would examine the affected areas and resources in greater detail. The EIS explains:

> Land use plan decisions, which are made on a broad (programmatic) scale, guide subsequent site-specific implementation decisions. Specific projects for any given resource, resource use, or resource program that are not analyzed in this Proposed RMP/Final EIS would be detailed in future activity plans or site-specific proposals, and additional NEPA analysis and documentation would be conducted as needed.

78.     Because the analysis in the Ely RMP EIS is programmatic, it contains very little specific or quantified information regarding environmental conditions in the planning area and the impacts of the various land-management activities authorized under the RMP. The EIS explains that "since many of the management actions presented for the alternatives are programmatic in nature, impacts are frequently described in qualitative terms, relying on best professional judgment." The EIS and RMP contemplate that more detailed, quantified data will be collected and analyzed through subsequent, site-specific NEPA analysis.

79.     Due in part to its programmatic nature, the EIS does not include any specific information on several special-status wildlife species occurring in the planning area, including sage-grouse and pinyon jay:

> Site-specific information is lacking for many of the special status species listed in Appendix E. . . . During implementation of this RMP, site-specific information is necessary for accurate impact analysis in support of proper habitat management for special status species. The programmatic analysis in this RMP/EIS can be completed without the site-specific information. . . . *An assumption was made for impact analysis in this programmatic RMP/EIS that the site-specific information would be collected during implementation of this RMP. Impacts to special status species would be evaluated during the watershed analysis process and through project-specific NEPA analysis.* (emphasis added)

80.     The EIS further admits that "[l]imited quantitative data exist regarding trends of vegetation communities within the planning area." Regarding sagebrush, the EIS notes that "quantitative information . . . especially within the planning area, is not available," and instead discusses "general patterns" across the Great Basin, which indicate "deterioration" of sagebrush vegetation communities.

81.     Although the EIS acknowledges the pinyon jay as a species "of management concern" due to population declines, it contains no analysis of the pinyon jay and its habitat other than an assertion that expansion and infill of pinyon and juniper woodlands "benefit species that occur primarily in woodland habitats" but "also lead to loss of forage (grass and forb) production within dense stands and a reduction of species diversity."

82.     The 2008 Ely RMP authorizes widespread destruction of sagebrush and pinyon-juniper woodlands, including the planned conversion of nearly five million acres of sagebrush to a "total herbaceous state (early, mid and late)." BLM plans to "treat" 70% of the sagebrush vegetation community, and maintain only 30% of the current sagebrush vegetation undisturbed. For pinyon-juniper, BLM plans to convert over one million acres to a "herbaceous state," and "treat" 77% of pinyon-juniper communities within the District, leaving only 23% undisturbed.

83.     The RMP's analysis of the environmental impacts of these treatments is not based on site-specific data or scientific literature, but rather on an "underlying assumption" that the treatments would be successful in achieving BLM's stated goals. The EIS explains:

> For purposes of the EIS analysis, the underlying assumptions are first that ongoing natural and human-related changes would continue in vegetation communities in the absence of management intervention, and second, that the successful application of treatments developed for a specific watershed would result in the maintenance or establishment of the desired range of conditions for the major vegetation communities in approximately the desired proportions. Thus, the planned management actions would increase vegetation and habitat resilience beyond that existing prior to the treatment.

84.     Nevertheless, the EIS accompanying the RMP acknowledges that vegetation removal treatments might have unintended, adverse consequences. The EIS explains:

> [A]ny vegetation manipulation involves certain risks that variables of weather, wildland fire, or other unpredicted circumstances may prevent immediate achievement of the desired results. Throughout most of the planning area, one of the more substantial risks is that unsuccessful treatments could accelerate the spread of invasive or noxious weed species, thereby contributing to further deterioration rather than restoration of ecological health.

The EIS further acknowledged that "43 percent of the sagebrush communities in the planning area are at moderate and 24 percent at high risk of displacement of sagebrush by cheatgrass."

**D. BLM Sage-Grouse Conservation Policy and RMP Amendments**

85.     In 2010, in response to the Service's finding that existing regulatory mechanisms, including BLM RMPs, were not sufficient to address the threats to the greater sage-grouse and its sagebrush habitat, BLM and other federal agencies initiated a range-wide sage-grouse conservation effort, which focused on amending BLM's RMPs (as well as the U.S. Forest

Service's Land and Resource Management Plans) to better protect the species and avoid an ESA listing. BLM acknowledged that "[c]hanges in management of [sage-grouse] habitats [were] necessary to avoid the continued decline of populations across the species' range."

86.    In 2011, BLM assembled a National Technical Team (NTT) of sage-grouse and sagebrush habitat experts to identify the best available science-based information to guide the RMP revision process. In 2011 the NTT issued a report entitled, "A Report on National Greater Sage-grouse Conservation Measures" (NTT Report), listing proposed conservation measures based on habitat requirements and other life-history aspects of the species. Because the NTT report was led and authored by the BLM's leading sage grouse scientists, it constitutes the agency's expert opinion to the extent that deference is due. The NTT Report also described the scientific basis for the proposed conservation measures. Federal Courts have acknowledged the NTT report "contains the best available science concerning the sage-grouse." *W. Watersheds Project v. Schneider*, 417 F.Supp.3d 1319, 1325 (D. Idaho 2019).

87.    The NTT Report found that "[s]age-grouse populations have the greatest chance of persisting when landscapes are dominated by sagebrush and natural or human disturbances are minimal." It therefore recommended reducing human disturbance within important sage-grouse habitats, and avoiding land management practices that reduce or eliminate sagebrush. Specifically, the NTT Report recommends that land managers permit no degradation of sage-grouse habitat through vegetation removal treatments, maintain sagebrush canopy cover of at least 15 percent, prohibit prescribed fire in sagebrush habitats receiving less than 12 inches of annual precipitation, and prohibit all treatments in winter habitat that do not "maintain winter range habitat quality."

88.    In 2012, the Service, with the support of the Western Governors Association Sage-Grouse Task Force, convened the Conservation Objectives Team (COT), composed of State and Federal representatives. One of the team's tasks was to produce a peer-reviewed report identifying the principal threats to sage-grouse survival. Another task was to determine the degree to which these threats need to be reduced or ameliorated. The goal was to conserve sage-grouse so that they

would no longer be in danger of extinction or likely to become in danger of extinction in the foreseeable future.

89.     The COT's peer-reviewed report, released in March 2013 (COT Report) identified Priority Areas for Conservation (PACs) and emphasized that "[m]aintenance of the integrity of PACs . . . is the essential foundation for sage-grouse conservation." The COT Report also emphasized the need to avoid or minimize additional disturbance in sage-grouse habitat:

> There is an urgent need to "stop the bleeding" of continued population declines and habitat losses by acting immediately to eliminate or reduce the impacts contributing to population declines and range erosion. There are no populations within the range of sage-grouse that are immune to the threat of habitat loss and fragmentation.

90.     The COT Report recommended an "avoidance first strategy" and stressed that "threats in PACs must be minimized" in order to meet sage-grouse population goals at both the federal and state levels. The COT Report also included specific conservation measures intended to reverse sage-grouse population declines and protect the species. These included:

- Eliminate intentional fires in sagebrush habitats, including prescribed burning of breeding and winter habitats.

- Address degraded sagebrush systems before fire occurs (*e.g.*, improve grazing systems).

- Retain all remaining large intact sagebrush patches, particularly at low elevations.

- Avoid sagebrush removal or manipulation in sage-grouse breeding or wintering habitats.

- Reduce or eliminate disturbances that promote the spread of these invasive species, such as reducing fires to a "normal range" of fire activity for the local ecosystem, employing grazing management that maintains the perennial native grass and shrub community appropriate to the local site, reducing impacts from any source that allows for the invasion by these species into undisturbed sagebrush habitats, and precluding the use of treatments intended to remove sagebrush.

91.     Drawing on the findings made in the Service's 2010 "warranted" finding, the NTT Report, the COT report, and other scientific sources, BLM and the U.S. Forest Service in 2015 amended 98 land-use plans across the West, including the 2008 Ely RMP, to incorporate more

robust protections for the greater sage-grouse. BLM explained that the purpose of the plan amendments was to "provide a comprehensive, coordinated, and effective conservation strategy for addressing the threats to the [greater sage-grouse] identified by the FWS [in the 2010 'warranted' finding] such that the need for additional protections under the ESA may be avoided." According to the BLM's Record of Decision (ROD) amending land-use plans in the Great Basin region, the amendments are "consistent with measures identified or recommended in the NTT Report, the COT report, recent [U.S. Geological Survey] studies, and other relevant research and analysis."

92.    BLM's 2015 plan amendments—known as Approved Resource Management Plan Amendments or ARMPAs—adopted the COT Report's "avoidance first" strategy. According to BLM's ROD, "[t]his avoidance first strategy is accomplished by identifying important sage-grouse habitat areas, then applying allocations that exclude or avoid surface-disturbing activities, appropriately managing grazing, and aggressively suppressing fire that could degrade or fragment remaining [greater sage-grouse] habitat."

93.    Based on the COT Report's identification of PACs, the ARMPAs delineated "priority habitat management areas" (PHMAs) on federal public lands. These PHMAs contain "lands identified as having the highest habitat value for maintaining sustainable [greater sage-grouse] populations." PHMAs roughly coincide with the PACs geographically but contain substantially fewer acres.

94.    The ARMPA for Nevada and Northeastern California also identified two additional categories of sage-grouse habitat outside of the PHMAs. "General habitat management areas," or GHMAs, consist of "habitat that is occupied seasonally or year-round and is outside of PHMAs." Within GHMAs, BLM stated, "special management would apply to sustain [sage-grouse] populations." Such areas "would be managed consistent with the COT report recommendation to recognize 'that important habitats outside of PACs are to be conserved to the extent possible.'" The Nevada/Northeastern California ARMPA also identified "other habitat management areas" or OHMAs, which "contain seasonal or connectivity areas."

95.    Within each habitat category, the ARMPAs establish specific sage-grouse "habitat objectives" for BLM to use in "evaluat[ing] management actions." Generally, the habitat objectives emphasize avoiding disturbance in and around sage-grouse habitat, and maintaining sagebrush cover above certain levels. Specific objectives for sagebrush cover retention range from 85% in winter areas to 20% in nesting areas. The ARMPAs direct BLM to maintain at least 15% sagebrush cover within PHMAs.

96.    The ARMPAs adopt the strategy of "avoid, minimize, and compensatory mitigation" for all proposed human disturbance within sage-grouse habitat. Under this strategy, "[t]he first priority [is] to avoid new disturbance." Where complete avoidance is not feasible, the plans require BLM to "minimize and mitigate any new disturbance." The ARMPAs further direct the agency to minimize habitat fragmentation and restore connectivity among sage-grouse populations.

97.    The ARMPAs impose specific restrictions on vegetation removal treatments, particularly those utilizing prescribed fire. BLM's 2015 ROD states that "prescribed fire will not be used in sagebrush steppe." However, the text of the ARMPAs provides a narrow exception to this general restriction: BLM must prepare a "burn plan" for each proposed use of prescribed fire in sage-grouse habitat, and conduct a NEPA analysis of the burn plan. BLM may only approve the use of prescribed fire if the burn plan NEPA analysis provides "a clear rationale for why alternative techniques were not selected as a viable option. The analysis would also need to explain how [sage-grouse] habitat goals and objectives would be met by [the use of prescribed fire] and how the COT Report objectives would be met." Moreover, BLM must conduct a "risk analysis to address how potential threats to [sage-grouse] habitat would be minimized."

98.    The ARMPAs also address mechanical treatments, such as mowing and chaining, in sage-grouse habitat. While such treatments are generally permitted, they are subject to the sage-grouse habitat objectives discussed above, and BLM must prepare a treatment plan demonstrating that any proposed treatment will be *beneficial* to sage-grouse. BLM's environmental impact statement for the 2015 ARMPAs envisions vegetation management actions that "increase[]

sagebrush height and herbaceous cover and vegetation productivity," and predicts that "fewer acres of sagebrush habitat" will be "converted to an early seral [*i.e.*, grassland or herbaceous] stage."

99.    Finally, the ARMPAs impose specific requirements on BLM regarding livestock grazing in sage-grouse habitat. The ARMPA EIS acknowledges that livestock grazing may impact "soils, vegetation health, species composition, water, and nutrient availability." The ARMPAs contemplate grazing reductions where habitat objectives are not being met, and admit that reducing grazing would "speed recovery of negatively impacted [greater sage-grouse] habitats." The ARMPA requires BLM to "rest areas that have received vegetative treatments from livestock grazing until resource monitoring data verifies the treatment objectives are being met *and an appropriate grazing regime has been developed*" (emphasis added).

100.    As amendments to existing RMPs, the ARMPAs are "programmatic" actions, which require site-specific planning and additional NEPA analysis in order to carry out their broad objectives. The ROD explains:

> Implementation decisions (or activity-level decisions) are management actions tied to a specific location. They generally constitute the BLM's final approval allowing on-the-ground actions to proceed and *require appropriate site-specific planning and NEPA analysis*. . . . These ARMPAs do not contain implementation decisions. *Implementation decisions and management actions that require additional site-specific project planning, as funding becomes available, will require further environmental analysis* (emphasis added).

Because the ARMPAs are programmatic actions which do not contain implementation decisions, BLM's NEPA analysis for the ARMPAs is also programmatic, and does not analyze the site-specific impacts of any particular action.

101.    Based largely on BLM's adoption of the ARMPAs, the Service in 2015 concluded that the greater sage-grouse was no longer warranted for ESA listing. The Service found that the plans represented a "paradigm shift in western Federal lands management in their focus on maintaining large expanses of sagebrush ecosystem for the benefit of sage-grouse and many other species." Combined with various state and private conservation efforts, the ARPMAs, according to the Service, "have substantially improved the regulatory mechanisms across the range of the

sage-grouse since the 2010 finding." The Service was particularly impressed that the 2015 Plans followed the "COT Report and NTT guidance [by] restricting impacts in the most important habitat [thereby] . . . ensur[ing] that high-quality sage grouse lands with substantial populations are minimally disturbed and sage grouse within this habitat remain protected." Accordingly, the Service found that there were adequate regulatory mechanisms to address the threats to the sage-grouse and its habitat, and that as such, ESA listing was not warranted.

102.     BLM revised the ARMPAs in March of 2019. However, on October 19, 2019 the Federal District Court for the District of Idaho enjoined implementation of those plan revisions. *Western Watersheds Project v. Schneider*, No. 1:16-cv-00083-BLW, ECF 189 (D. Idaho Oct. 16, 2019). Consequently, the 2015 ARMPAs apply to the Spring/Hamlin project.

103.     Since 2015, BLM has engaged in several other large-scale programmatic planning efforts within the range of the greater sage-grouse. These include the Programmatic EIS for Fuel Breaks in the Great Basin, finalized in March 2020, and the Programmatic EIS for Fuels Reduction and Rangeland Restoration in the Great Basin, finalized in November 2020. These planning efforts, like the ARMPAs and the Ely RMP, consider the environmental impacts of various vegetation removal techniques at the programmatic level. For example, the analysis area for both the Fuel Breaks PEIS and the Fuels Reduction PEIS reaches across six states and covers over 223 million acres. Consequently, these plans and analyses do not analyze the site-specific impacts of individual projects, or impacts to specific areas, such as sage-grouse and pinyon jay habitats within Spring and Hamlin valleys.

**E. The Project**

104.     The Project authorizes various vegetation removal methods, including chaining, mowing, harrowing, and prescribed fire, across 384,414 acres in Spring and Hamlin valleys. The Project area is approximately 45 to 59 miles northeast of Caliente, Nevada and approximately 25 to 85 miles southeast of Ely, Nevada. As BLM acknowledged in its EA, the area contains "diverse and widespread" wildlife habitat, including sage-grouse PHMA, sage-grouse GHMA, and extensive pinyon-juniper woodlands. Other wildlife species that regularly inhabit the Spring and

Hamlin valleys include Rocky Mountain elk, pronghorn antelope, mule deer, Rocky Mountain bighorn sheep, several small mammals and reptiles, and several native fish with highly restricted ranges. The northeastern boundary of the Project area abuts Great Basin National Park. The Project area also entirely surrounds the *Bahsawahbee* sacred site, which is located in central Spring Valley.

105.    BLM initiated its planning process for the Project in 2012, but shortly thereafter paused the process until 2018. Between April 19 and May 21, 2018, BLM held a 30-day "scoping" period in which it solicited public comment on the proposed project. On June 23, 2021, BLM release a "preliminary EA" and held another 30-day comment period. The Center and Western Watersheds both submitted public comment letters to BLM. Generally, the comment letters highlighted the potential negative impacts of the proposed treatments, requested a more informative analysis of the Project's environmental impacts, and warned BLM that it could not approve site-specific actions through a programmatic EA.

106.    On September 28, 2022, BLM issued its Decision approving the Project, along with a final EA and FONSI. Consistent with its regulations, BLM served its Decision, EA, and FONSI on the Center and Western Watersheds via certified U.S. mail. The Center and Western Watersheds received BLM's Decision Record, final EA, and FONSI on October 5, 2022.

107.    The Decision Record authorizes a variety of vegetation removal methods across the 384,414-acre Project area. These include chaining to deforest established pinyon juniper woodlands, mechanical removal and shredding of low- to high-density pinyon-juniper woodlands, clearcutting or selective hand-cutting of pinyon-juniper woodlands, mowing and various other methods of destroying or removing sagebrush, application of herbicides, and prescribed fire.

108.    According to the EA, "chaining" involves "using the Ely Anchor Chain (Navy ship anchor chain with 40-120 pound links and 18-inch railroad iron welded perpendicular to the chain link) and/or smooth chain (chain with 40-120 pound links) pulled between two bulldozers." Chaining treatments "would consist of one or two-way (chaining the trees twice, once from one direction, then from a different direction) chaining." Chaining would occur in more developed or established pinyon-juniper stands, with greater that 10% tree cover.

109.    "Mastication," according to the EA, involves "mechanical removal of pinyon and juniper" using logging equipment with a "cutting head" designed to reduce trees to mulch. The mulch is then either piled or scattered. Mastication would be used "where tree densities fall below the threshold for chaining," i.e. where there is less than 10% tree cover.

110.    The EA states that vegetation removal activities may use a "dixie harrow" to remove and reduce sagebrush, including in PHMA. A "dixie harrow" "consists of a large spike-tooth harrow [an industrial farming tool] pulled by a four-wheel drive rubber-tired tractor." In addition to direct "treatment" of sagebrush habitats as part of the vegetation removal activities, "[t]he Dixie harrow may be used as a secondary treatment within areas that have been treated for removal of pinyon and juniper to further reduce the shrub component . . . "

111.    Another proposed sagebrush vegetation removal method is the "roller chopper." "Roller chopper treatment involves the use of a large drum with paddles attached that is pulled behind a piece of machinery such as a tractor or bulldozer." The drum "crushes and chops brush and small trees." Like the dixie harrow, the EA states that a roller chopper may be used as a secondary treatment to remove sagebrush from areas where pinyon and juniper trees have already been removed.

112.    A third proposed method to reduce or remove sagebrush around the Project area is "mowing." This method involves "use of a mowing deck pulled behind a tractor." Trees may be removed in treatment areas prior to mowing. According to the EA mowing could be used to reduce shrub height to anywhere "from ground level to 12-15 inches high," and would result in 40-100% sagebrush mortality, depending on the mower deck height. As with the dixie harrow and roller chopper, mowing may be used as a "secondary treatment" for sagebrush remaining in pinyon-juniper removal areas.

113.    Prescribed fire is authorized under the Decision in both sagebrush and pinyon-juniper habitats. Although BLM claims the purpose of the project is to *restore* the native perennial understory, the EA states that prescribed fire would be used in areas "with existing native perennial understory species." BLM plans to target a wide range of vegetation for prescribed burning across

the Project area, including native vegetation types such as "aspen, mixed conifer, mountain mahogany, sagebrush, mountain brush, and sagebrush communities where pinyon and juniper have become established." Habitats that could be "incidental[ly]" impacted by prescribed burns include "limber pine, bristlecone pine, lower elevation Wyoming big sagebrush and black sagebrush (generally areas where precipitation is less than 10 inches annually), and salt desert scrub communities." The EA states that prescribed burning will be specifically utilized to "reduce the shrub component" of the targeted habitats. Like the other methods described above, prescribed fire could be used as a "secondary treatment."

114.    All of these vegetation removal methods, in addition to hand-cutting of trees, are authorized across the entire 384,414-acre Project area, including in PHMA and GHMA. Although BLM divided the Project area in 13 "restoration units," the EA states that "any treatment could be implemented in any unit as part of an adaptive management process."

115.    Despite the inherently impactful nature of the proposed activities, and the sensitive nature of the affected species and habitats, BLM concluded that the Project would have no significant environmental impacts. BLM reached this conclusion through a broad-scale analysis that does not consider the impacts of the Project on specific locations, habitats, or species. The EA considers the impacts of the proposed treatments only generally across the 384,414-acre Project area and defers critical decisions about siting, methods of implementation, and mitigation to future decisions which will not undergo additional site-specific NEPA review. As a result, the public has been left to speculate as to where the proposed treatments will occur, how the treatments will be conducted, and how the treatments will impact specific habitats, such as pinyon-jay nesting habitat and the three areas of PHMA within the Project area.

116.    The EA provides only the most general information about the affected environment and the impacts of the proposed treatments, and includes no specific or detailed information on where, how, or when treatments will be conducted. For example, the EA's description of the "proposed action" states: "Vegetative community restoration could take place across 13 restoration

units covering up to approximately 123,969 acres over a total of 384,414 acres within the project area."

117.    The EA's description of the "affected environment" is similarly general and vague, devoid of critical details necessary for understanding the Project's site-specific environmental impacts. Some sections of the EA, such as "soils" and "vegetation," simply recite characteristics common to cold-desert valleys in the Great Basin. Other sections, such as "wildlife" and "wetlands and riparian areas" merely provide a general list of species or habitats that may be found within the Project area, without any geographic specificity. The "affected environment" description for migratory birds consists of a single sentence: "Migratory bird habitats are located throughout the planning area." And for species of conservation concern such as the pygmy rabbit and pinyon jay, the final EA offers only a general description of the species' habitat requirements, and presents no information on where these species actually occur in the project area, or where occupied or suitable habitat is located in relation to the proposed treatments.

118.    The EA's analysis of the Project's environmental impacts confirms that BLM has conducted a general, programmatic review that is insufficient for site-specific implementation. For many of the affected resources, the EA fails to consider the site-specific impacts of the proposed vegetation removal, or even disclose where specific treatments would occur. Concerning soil resources, the EA states, "[t]he degree of … effects would vary depending on the type of vegetation restoration treatments being implemented" and discusses some impacts which "may" occur without any indication of how likely they are or how severe they could be. The EA's wildlife analysis, meanwhile, concludes that "effects to wildlife would range from negligible to major depending on the species and their habitat." Apart from a general discussion about the purported benefits of treatments generally, the EA offers no treatment-, habitat-, or species-specific analysis of the Project's likely impacts. As with BLM's description of the affected environment, the EA's impacts analysis for migratory birds is entirely cursory, consisting of two sentences.

119.    The EA does not even offer a site-specific analysis of impacts to vegetation, even though the main purpose of the Project is to remove or reduce vast swathes of pinyon-juniper and

34

sagebrush. Instead, the EA simply asserts that BLM will manage for a "desired range of conditions" across the entire project area, and provides a regulatory—not environmental—analysis, discussing the general requirements of the Ely RMP and the applicable ARMPA. And although the EA acknowledges these regulatory requirements, it does not consider the potential impacts of the proposed treatments in light of the ARMPA's overriding objectives of retaining sagebrush and preventing the degradation of sagebrush habitats. Nor does the EA acknowledge the NTT and COT recommendations regarding mechanical treatments and prescribed fire in sagebrush habitats.

120.    The EA takes a similar, general approach to special-status species, such as the pygmy rabbit and pinyon jay. Although BLM's goals for the Project call for the widespread elimination of these species' habitat (i.e. pinyon-juniper woodland and dense sagebrush), the EA entirely fails to consider Project- or site-specific impacts to these species. BLM's analysis of impacts to the pinyon jay consists of a short, general description of how pinyon-juniper removal "could" affect the species generally, with no discussion of where pinyon jay occurs in the Project area, or how specific treatments in specific locations could impact pinyon jay habitat.

121.    Regarding the pygmy rabbit, the EA simply states: "[e]xpanded sagebrush vegetation would increase breeding, nesting, and foraging habitat for sagebrush obligate species such as [greater sage-grouse], pygmy rabbit, and other sagebrush dependent species," but one of the Project's main objectives is to *reduce* sagebrush through mechanical treatments and prescribed fire. As a result, the EA fails to address the net effects on these species from the Project. And despite the Ely RMP requiring BLM to "consider the habitat needs of obligate bat species in restoration treatments," the EA contains only a single sentence on tree-roosting bats.

122.    Because the EA takes a broad, programmatic approach, it does not satisfy NEPA's requirement to take a "hard look" at a Project's environmental impacts based on quantified, detailed information. The EA's analysis is cursory and thus insufficient with respect to special-status species, biological soil crusts, invasive annual grasses, and impacts to Lands with Wilderness Characteristics.

123.    As noted, the Ely RMP requires BLM to "[m]itigate all discretionary permitted activities that result in the loss of special status species habitats on a ratio of 2 acres of comparable habitat for every acre of lost habitat as determined on a project-by-project basis." The EA entirely fails to mention this mitigation requirement, identify how much special-status-species habitat will be impacted as a result of the proposed treatments, or how BLM will ensure a two-to-one mitigation ratio for any lost habitat. BLM cannot perform this analysis because it has failed to specify where, when, and how treatments would be conducted.

124.    Similarly, the Ely RMP requires BLM, when conducting activities in riparian areas and pinyon-juniper woodlands, to "consider the habitat needs of obligate bat species in restoration treatments." But even though the EA specifies throughout that removal of pinyon and juniper trees is a primary objective of the Project, it contains no analysis or discussion of impacts to tree-roosting bats. The EA does not even specify what bat species are present in the affected area, and what their habitat needs are. The EA merely offers speculative statements and an unsupported conclusion. The EA acknowledges that "[t]ree roosting bats may be disturbed, displaced, or killed during implementation of vegetation treatments," but then, without providing any detail about where the treatments would occur, states "suitable habitat exists adjacent to the treatment areas." The EA then simply concludes, "the actions should not affect local bat populations." NEPA's hard look requirement demands more.

125.    The final EA presents only the most cursory analysis of impacts to the pinyon jay from the proposed pinyon-juniper removal treatments. The final EA simply speculates that treatments "could" have an impact on the species, and states, without citations or discussion, that unspecified "design features" would reduce these impacts. BLM fails to identify occupied pinyon jay habitat within the Project area, determine the likely treatments that would be applied in any occupied habitat, or discuss the impacts of treatments to this habitat in the context of the pinyon jay's habitat needs. Indeed, the EA contains no discussion whatsoever about the species' specific habitat needs. Nor does the EA evaluate the proposed action and "design features" in light of the recommendations in the Conservation Strategy for the Pinyon Jay produced by the Service—there

is no discussion whatsoever about whether BLM would identify nesting and colony sites, whether BLM would conduct treatments in these sites or not, and how the proposed treatments would impact the availability of pinyon nuts, one of the pinyon jay's primary food sources.

126. The EA contains no information on local pygmy rabbit locations, occupied habitat, or if there has been a response to past treatments in the project area. BLM simply assumes the Project will be a success, without considering any data whatsoever on pygmy rabbits or their habitat within the Project area.

127. The EA fails to analyze the impacts of the proposed treatments on biological soil crusts, which are an integral part of soil ecology in the Great Basin and help to prevent the invasion of exotic species such as cheatgrass. Biological soil crusts can be extremely sensitive to disturbance and take decades to regenerate. Without biological crust cover, the risk of cheatgrass invasion increases. The EA's entire analysis of potential impacts to biological soil crusts consists of a statement postulating that crusts "could" be impacted. There is no discussion of where crusts occur in the Project area, what condition they are in, what role they play in the local ecology, or what the potential short- and long- term impacts could be if crusts are degraded or destroyed during treatment.

128. The EA also fails to examine one of the most foreseeable impacts from the proposed vegetation removal—invasion by exotic annual grasses. A large body of scientific literature, including sources cited in the EA and included in the Project record, conclude that mechanical disturbance in sagebrush and pinyon-juniper habitats has a high potential to promote exotic grass invasion. But even though cheatgrass invasion is a foreseeable risk of the proposed treatments, and even though cheatgrass invasion contributes to many of the "undesirable" conditions identified in the final EA, including reduced perennial bunchgrass cover, reduced wildlife habitat function, and unnaturally large and frequent wildfires, the EA contains only the most cursory analysis of potential for cheatgrass invasion. As with many of the Project's foreseeable risks, the EA simply states that cheatgrass "may" increase after treatment, and that "seeding and chemical treatment" could decrease this. Notably, the EA contains no analysis of the efficacy of these weed control

measures; nor does BLM commit to ensuring that these mitigation measures are actually implemented.

129.    According to the EA, the Project area overlaps with 11 Lands with Wilderness Characteristics (LWCs), and the Project authorizes a variety of treatments on these lands, including mastication, chaining, mowing, and prescribed fire. BLM maintains discretion under FLPMA to manage LWCs under a "non-impairment" standard, and BLM has exercised that discretion through the Ely RMP, which requires BLM to "[m]anage lands identified as having wilderness characteristics to protect those characteristics through a variety of land use plan decisions . . . ." However, the EA fails to adequately consider impacts to LWCs, or discuss whether proposed treatments within LWCs would meet the BLM's own "non-impairment" standard under the Ely RMP. The EA merely states that wilderness characteristics such as "naturalness" would be "temporarily affected," but would return once the treated areas "recover." This analysis lacks meaningful detail including a necessary analysis of the temporal element. Specifically, it fails to acknowledge that natural restoration of sagebrush and pinyon-juniper can take decades or longer. The EA thus indirectly admits that the Project would have a decades-long impact on key wilderness characteristics, but fails to even acknowledge, let alone analyze, that impact. As with the other resources discussed here, the general, programmatic nature of BLM's analysis makes it insufficient for understanding the Project's direct, indirect, and cumulative impacts to wilderness characteristics.

130.    Finally, the EA fails to take a "hard look" at impacts to greater sage-grouse. Among other things, the EA fails to consider the well-documented negative effects that sagebrush removal can have on greater sage-grouse. As explained above, the EA discusses published research (Severson et al. 2017) showing that targeted removal of expanding pinyon-juniper trees may benefit sage-grouse nesting success. But an even larger body of literature, which includes the NTT and COT reports, warns *against* implementing treatments such as chaining, mowing, roller-chopper, dixie harrow, and prescribed fire in sage-grouse habitat generally, and PHMA specifically. The EA fails to even mention, let alone consider, the significant and well-documented

risks posed by mechanical and prescribed-fire sagebrush treatments in PHMA. Moreover, the EA failed to examine the actual current condition of PHMA in the project area as part of the NEPA baseline analysis.

131.    Contrary to ARMPA management direction, as well as NTT and COT recommendations, BLM has not prepared a treatment plan that shows the proposed treatments would be beneficial for sage-grouse. Nor has BLM prepared a burn plan for the proposed prescribed fire treatments, or analyzed a burn plan under NEPA to determine that the proposed use of prescribed fire would be beneficial or detrimental to sage-grouse. The EA and Decision state that burn plans will be developed at a later date, and would not be subject to NEPA review.

132.    The EA further omits analysis of important cumulative impacts, most notably the impacts of livestock grazing throughout the Project area. Virtually all of the BLM public lands within the project area are grazed, and according to the EA, many areas exhibit conditions symptomatic of livestock overgrazing, including low cover of perennial bunchgrasses, reduced cover of biological crusts, and exotic invasive species such as cheatgrass. The EA discloses that public lands within the Project area are failing to meet the BLM's Standard of Rangeland Health, which the agency uses to evaluate the impacts of livestock grazing and the effectiveness of its grazing management. Grazing is expected to continue throughout the Project area for the foreseeable future. Nevertheless, the final EA analyzes only the impact of the Project on livestock grazing operations—it does not consider the cumulative effects of continuing livestock grazing on natural resources. BLM offers no analysis of past, present, and reasonably foreseeable impacts of livestock grazing in the EA. The EA's discussion of cumulative impacts simply lists past projects and activities that "could occur" within 10 years, and offers general speculation about these "past and future actions" collectively, with no specific discussion of particular activities such as livestock grazing.

133.    The EA and Decision leave the decision whether to rest treated areas from livestock grazing to BLM's discretion in the future. In some cases, "[l]ivestock grazing would resume immediately within treatment areas . . . ."

134.    BLM has represented to the Center and Western Watersheds that the vegetation reduction and removal authorized under the Decision Record will begin in the fall of 2023.

## FIRST CLAIM FOR RELIEF

### BLM's Final EA, FONSI, and Decision Record Violate NEPA and the APA

135.    Western Watersheds and the Center hereby incorporate by reference all preceding paragraphs.

136.    NEPA requires federal agencies to take a "hard look" at the environmental impact of any proposed federal action and provide a "full and fair discussion" of all direct, indirect, and cumulative impacts of the proposed action. 40 C.F.R. §§ 1502.1, 1502.14, 1502.16 (2019). A "hard look" under NEPA requires quantified or detailed information, including site-specific information.

137.    The final EA does not provide site-specific information about the Project or its impacts. The final EA does not disclose specific locations were proposed activities, including chaining, prescribed fire, and various means of mechanical sagebrush reduction, will occur. As of the Project's approval date in October 2022, BLM had not determined where within the Project area these activities would occur.

138.    As a consequence of this approach, the final EA does not adequately assess the direct, indirect, and cumulative impacts of the Project on the human environment. The final EA does not contain sufficient information to foster informed decisionmaking and public participation. And the final EA fails to examine impacts on multiple sensitive resources, even though consideration of these resources is expressly required in BLM's own regulations, plans, and policies.

139.    For these reasons, BLM's actions and omissions regarding the Project violate NEPA and are arbitrary, capricious, an abuse of discretion, not in accordance with law, without observance of procedure required by law, and in excess of statutory jurisdiction, authority, or limitations, within the meaning of the judicial review provisions of the APA. 5 U.S.C. §§ 701-706.

**SECOND CLAIM FOR RELIEF**

BLM's Final EA, FONSI, and Decision Record Violate FLPMA and the APA.

140.    Western Watersheds and the Center hereby incorporate by reference all preceding paragraphs.

141.    FLPMA requires that the public lands be managed "in accordance with" land use plans. 43 U.S.C. § 1732(a). "All . . . resource management authorizations and actions" must "conform to the approved plan." 43 C.F.R. §§ 1610.5-3(a). If a proposed action is not consistent with the applicable land use plan, BLM must deny the proposed action or propose and adopt an amendment to the plan. 43 C.F.R. §§ 1610.5-3, 1610.5-5.

142.    The approved land use plan applicable to the Project is the 2008 Ely RMP, as amended by the 2015 ARMPA. The 2008 Ely RMP expressly requires BLM to "[m]itigate all discretionary permitted activities that result in the loss of special status species habitats on a ratio of 2 acres of comparable habitat for every 1 acre of lost habitat as determined on a project-by-project basis"; and "consider the habitat needs of obligate bat species in restoration treatments." As amended by the 2015 ARMPA, the 2008 Ely RMP requires BLM to demonstrate, based on a treatment plan or burn plan, that any proposed mechanical or prescribed fire treatment in PHMA would be beneficial to sage-grouse and meet the ARMPA's sage-grouse habitat objectives.

143.    The final EA, FONSI, and Decision Record do not comply with the 2008 Ely RMP as amended. The final EA, FONSI, and Decision Record make no mention of the RMP's requirement for two-to-one mitigation, or even discuss mitigation for the Project's adverse impacts. The final EA, FONSI, and Decision Record do not consider the habitat needs of tree-roosting bats. And the final EA, FONSI, and Decision Record fail to show that the proposed treatments would be beneficial for sage-grouse, or result in compliance with the ARMPA's sage-grouse habitat objectives.

144.    For these reasons, BLM's actions and omissions noted above regarding its review and approval of the Project violate FLPMA and its implementing regulations. BLM's actions and omissions in reviewing and approving the Project are therefore arbitrary, capricious, an abuse of

discretion, not in accordance with law, without observance of procedure required by law, and in excess of statutory jurisdiction, authority, or limitations, within the meaning of the judicial review provisions of the APA. 5 U.S.C. §§ 701-706.

**PRAYER FOR RELIEF**

WHEREFORE, Western Watersheds and the Center respectfully request that this Court:

A.    Declare that BLM's EA, FONSI, and Decision are unlawful under NEPA and arbitrary and capricious under the APA;

B.    Declare that BLM's EA, FONSI, and Decision are unlawful under FLPMA and the APA;

C.    Vacate and set aside the final EA;

D.    Vacate and set aside the FONSI;

E.    Vacate and set aside the Decision;

F.    Enjoin any implementation of the Decision;

G.    Award Western Watersheds and the Center costs, expenses, expert witness fees, and reasonable attorney fees pursuant to applicable law including the Equal Access to Justice Act, 28 U.S.C. § 2412; and

H.    Grant Western Watersheds and the Center such further relief as may be just, proper, and equitable.

Dated March 23, 2023                    Respectfully submitted,

                                        */s/ Scott Lake*
                                        Scott Lake
                                        Center for Biological Diversity
                                        P.O. Box 6205
                                        Reno, NV 89513
                                        (802) 299-7495
                                        slake@biologicaldiversity.org

                                        *Attorney for Plaintiffs*