# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

Western Watersheds Project, et al.,

         Plaintiffs

   v.

U.S. Department of the Interior, et al.,

         Defendants

Case No. 2:23-cv-00435-CDS-DJA

**Order Denying Plaintiffs' Motion for Preliminary Injunction and Plaintiffs' Motion for Temporary Restraining Order**

[ECF Nos. 14, 17]

Plaintiffs Western Watersheds Project and the Center for Biological Diversity (together, plaintiffs) seek a preliminary injunction to halt the implementation of the South Spring Valley and Hamlin Valley Watersheds Restoration Project (hereinafter, the Project), arguing that the Project's environmental assessment violates the Administrative Procedure Act (APA), National Environmental Policy Act (NEPA), and the Federal Land Policy and Management Act (FLPMA). ECF No. 14. Defendants filed their opposition (ECF No. 15), to which plaintiffs replied (ECF No. 16). This motion is now fully briefed. Plaintiffs subsequently filed a motion for temporary restraining order. ECF No. 17. For the reasons set forth herein, plaintiffs' motion for preliminary injunction and motion for temporary restraining order are DENIED.[1]

## I.  Procedural History

On March 23, 2023, plaintiffs filed a complaint for declaratory and injunctive relief against the U.S. Department of the Interior, the U.S. Bureau of Land Management (BLM), Jared Bybee, as Field Manager of the BLM Bristlecone Field Office, and Kenneth Kendrick,[2] as Acting Field Manager of the BLM Caliente Field Office. Compl., ECF No. 1. The complaint challenges

---

[1] The court is not ruling on the merits of plaintiffs' claims. This order only addresses plaintiffs' motion for preliminary injunction (ECF No. 14) and temporary restraining order (ECF No. 17).

[2] Under Fed. R. Civ. P. 25(d), Kenneth Kendrick is automatically substituted for former Field Managers Shirley Johnson and Alicia Styles as a defendant.

the South Spring Valley and Hamlin Valley Watershed Restoration Plan Decision Record (Decision Record),[3] the associated final environmental assessment (EA), and finding of no significant impact (FONSI). *Id.*

On August 23, 2023, plaintiffs filed the instant motion for a preliminary injunction to stop defendants from implementing part of the Project,[4] asserting: (1) the Project EA violated NEPA, and (2) that the Project violated FLPMA by failing to ensure it complied with the Ely Resource Management Plan (Ely RMP).[5] *See* ECF No. 14. Defendants oppose the motion, arguing: (1) plaintiffs fail to demonstrate that an injunction is warranted, (2) plaintiffs mischaracterize the purpose behind the Project, and (3) despite plaintiffs' disagreement with the implementation strategy, the Project is both "legal" and "well-considered." *See generally* ECF No. 15. On October 11, 2023, plaintiffs filed the instant motion for a temporary restraining order to prevent imminent irreparable harm and to preserve the status quo pending this court's decision on their motion for preliminary injunction. ECF No. 17 at 1. I rule on both motions in this one order because the standard for issuing a preliminary injunction is "essentially identical" to the standard for issuing a temporary restraining order. *Chandler v. Williams*, 2010 WL 3394675, at *1 (D. Or. Aug. 26, 2010) (citing *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001)).

---

[3] The Decision Record discusses the factors considered in approving the Project. The Decision Record is included as plaintiffs' Exhibit 18 to their motion for preliminary injunction and is discussed further *infra* section II.

[4] The Project Area is located within northeast Lincoln County, Nevada and southeast White Pine County, Nevada. EA, Defs.' Ex. 5, ECF No. 15-5 at 7. The Project at issue in this case involves approximately 2,000 acres of the Project Area. Email Exchange re Protect timeline, Pls.' Ex. 19, ECF No. 14-19 at 5. The overall Project Area is approximately 666,531 acres. EA, Defs.' Ex. 5, ECF No. 15-5 at 7.

[5] The Federal Land Policy Management Act (FLPMA) directs the BLM to develop and maintain comprehensive Resource Management Plans (RMPs), such as the Ely RMP, that governs all aspects of public land management. *See* 43 U.S.C. § 1712. The Ely RMP, which was produced in November of 2008, is included as defendants' Exhibit 3, ECF No. 15-3, and is further discussed *infra* in Section B.

## II.     Background

In 2008, the BLM evaluated the South Spring Valley and Hamlin Valley watersheds to determine if they met BLM's rangeland health standards. EA, Defs.' Ex. 5, ECF No. 15-5 at 5. The BLM uses these standards to determine whether watersheds are functioning properly; whether water quality complies with state water quality requirements; whether habitats of protected species are functioning properly; and whether ecological processes are functioning properly to support healthy biotic populations and communicates. Ely District Record of Decision and Approved Resource Management Plan, Pls.' Ex. No 13, ECF No. 14-13 at 8. The evaluation indicated that the vegetation communities and riparian areas that exist within the watersheds did not meet the desired range of conditions for each community as specified in the Ely RMP. EA, Defs.' Ex. 5, ECF No. 15-5 at 5, 7. Both watersheds had a problematic increase of wood species, including pinyon-juniper, which decrease grasses and forbs[6] in the understory vegetation. *Id.* at 6. The evaluation also showed that both valleys were at a moderate to high risk of wildfire. *Id.*

To improve watershed health in the South Spring and Hamlin Valley Watersheds, as well as to meet the Ely RMP objectives, the BLM analyzed the environmental impact of treating the vegetation of both watersheds under three alternatives. *Id.* at 7, 10. After 2008, the BLM worked with state wildlife agencies and commissioned additional resources to identify the needs and impact of implementing this project. *See* Record of Decision and Approved Resource Management Plan Amendments for the Great Basin Region (ARMPA) ECF No. 15-4 at 4–5. This included Nevada-specific considerations, which incorporated information from state conservation plans and research. *See id.* at 42–43; *see also* 2020 Fuels Reduction and Rangeland Restoration in the Great Basin Environmental Impact Statement (FRRR FEIS), Defs.' Ex. 1, ECF

---

[6] A forb is defined as an herb other than grass. *See* https://www.merriam-webster.com/dictionary/forb (last accessed October 13, 2023).

No. 15-1. The BLM's efforts resulted in the creation of the FRRR FEIS and ultimately, the EA. EA, Defs.' Ex. 5, ECF No. 15-5.

On June 23, 2021, a preliminary EA for the Project's proposal was released, and public comments were accepted for a period of thirty days. FONSI, Defs.' Ex. 8, ECF No. 15-8 at 2. On September 28, 2022, the BLM released their Decision Record which approved the Project and issued a FONSI. *Id.*; *see also* Decision Record, Pls.' Ex. 18, ECF No. 14-18 at 2. The BLM determined that the Project "will not significantly affect the quality of the human environment and that an Environmental Impact Statement is not required." FONSI, Defs.' Ex. 8, ECF No. 15-8 at 2–3.

The stated goals of the Project are "to restore site conditions to meet vegetation and ecological objectives, reduce potential for large wildfires by reducing fuel loading, increase understory grass and forb species diversity, increase, and improve available wildlife habitat, and improve riparian conditions." Decision Record, Pls.' Ex. 18, ECF No. 14-18 at 2. This includes restoring sagebrush communities for greater sage-grouse and other species, and allowing for pinyon and juniper trees to continue growing. Teel Decl., Defs.' Ex. 9, ECF No. 15-9 at ¶¶13, 25. The Project divides the watersheds into thirteen treatment units, of which up to 123,969 acres (roughly 19%) to be treated. *Id.* at ¶9; EA, Defs.' Ex. 5, ECF No. 15-5 at 11. Each treatment unit is grouped into one of four treatment categories based on similar existing conditions and objectives for restoration. Teel Decl., Defs.' Ex. 9, ECF No. 15-9 at ¶¶11–12; EA, Defs.' Ex. 5, ECF No. 15-5 at 11. The four categories include sagebrush removal of pinyon and juniper trees, direct sagebrush treatment, prescribed fire, and high elevation. Teel Decl., Defs.' Ex. 9, ECF No. 15-9 at ¶8; EA, Defs.' Ex. 5, ECF No. 15-5 at 11.

The first two implementations of the Project, scheduled to start as early as October 2023, include a 1,500-acre treatment of hand cutting pinyon-juniper and a 1,680-acre treatment of Limestone Chaining within the border of South Spring and Hamlin Valleys. Email Exchange re Protect timeline, Pls.' Ex. 19, ECF No. 14-19; Teel Decl., Defs.' Ex. 9, ECF No. 15-9 at ¶12,

Attachment B (project placement). As set forth in BLM Fire Ecologist Kyle Teel's Declaration, the selected vegetation communities were selected because: (1) its "deviation from historical reference conditions"; (2) it is the first area that requires restoration leading into the sage-grouse habitat in the Hamlin Valley Watershed; and (3) the connection between sage-grouse habitat in the Hamlin Valley and South Spring Valley. Teel Decl., Defs.' Ex. 9, ECF No. 15-9 at ¶¶8, 12. They were also selected because of their proximity to past wildfires that occurred in the Hamlin Valley. Coombs Decl., Defs.' Ex. 10, ECF No. 15-10 at ¶6.

### III.    Legal standard

The standards for a preliminary injunction and a temporary restraining order (TRO) are essentially the same. *Stuhlbarg Int'l Sales Co., Inc.*, 240 F.3d at 839 n.7 ("Because our analysis is substantially identical for the [preliminary] injunction and the TRO, we do not address the TRO separately."). A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Defense Council, Inc.*, 555 U.S. 7, 22 (2008). The Ninth Circuit uses two alternative tests to determine whether a preliminary injunction should issue. Under the traditional test, a plaintiff seeking an injunction must prove that: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable injury in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Textile Unlimited, Inc. v. A. BMH & Co., Inc.*, 240 F.3d 781, 786 (9th Cir. 2001) (citing *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1200 (9th Cir. 1980)).

In the alternative, the Ninth Circuit uses a "sliding scale" approach. *All. For the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–32 (9th Cir. 2011). Under this test, a preliminary injunction may issue if there are serious questions going to the merits of the case, the balance of hardships tips sharply in the plaintiff's favor, and the other two *Winter* factors are satisfied. *Bartell Ranch LLC v. McCullough*, 558 F. Supp. 3d 974, 979 (D. Nev. 2021), *reconsideration denied*, 570 F. Supp. 3d 945 (D.

Nev. 2021), *appeal dismissed*, No. 22-15059, 2022 WL 1165410 (9th Cir. Apr. 4, 2022) (citing *Cottrell*, 632 F.3d at 1135).

## IV.   Discussion

    *A.   Likelihood of success on the merits.*

        1.   NEPA

Plaintiffs first argue that the Project violates NEPA. ECF No. 14 at 12. NEPA is this country's national charter for protection of the environment. *'Ilio'ulaokalani Coal. v. Rumsfeld*, 464 F.3d 1083, 1093 (9th Cir. 2006) (citing 40 C.F.R. § 1500.1(a) (2006)). While NEPA does not impose any direction or restriction on the ultimate action of an agency, *Hillsdale Env't Loss Prev. v. U.S. Army Corps of Eng'rs*, 702 F.3d 1156, 1166 (10th Cir. 2012), it does require "Federal agencies to provide a detailed statement on proposals for major Federal actions significantly affecting the quality of the human environment." 40 C.F.R. § 1500.1(a). "The purpose and function of NEPA is satisfied if Federal agencies have considered relevant environmental information, and the public has been informed regarding the decision-making process." *Id.* NEPA does not impose particular substantive content, but rather requires the agency to take a "hard look" at the potential environmental consequences of a proposed action. *Friends of Animals v. BLM*, 2018 WL 1612836, at *11 (D. Or. Apr. 2, 2018) ("Thus, the Ninth Circuit has affirmed that the important question is whether the agency has taken a 'hard look' at the environmental impacts of a proposed action."). A "hard look includes determining whether the agency adequately evaluated all potential environmental impacts of the proposed action, analyzed all reasonable alternatives to the proposed action, and identified and disclosed to the public all foreseeable impacts of the proposed action." *Ctr. For Biological Diversity v. U.S. Bureau of Land Mgmt.*, 2019 WL 236727, at *11 (D. Nev. Jan. 15, 2019) (citing 42 U.S.C § 4332(2)(C)).

As part of the hard look requirement, NEPA requires federal agencies to prepare a "detailed statement" concerning "every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment."

42 U.S.C. § 4332(2)(C). This statement may take the form of an EA or an EIS. 40 C.F.R. §§ 1508.9, 1508.11. An EA "[s]hall include brief discussions of the need for the proposal, of alternatives as required by [NEPA] section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." 40 C.F.R. § 1508.9(b). If after conducting an EA, a determination is made that environmental impacts are significant, then an EIS is prepared. 40 C.F.R. § 1508.13. However, if the EA determines that impacts are not significant, a FONSI will be prepared in lieu of an EIS. *Id.* A FONSI "shall include the [EA] or a summary of it and shall note any other environmental documents related to it....If the assessment is included, the finding need not repeat any of the discussion in the assessment but may incorporate it by reference." 40 C.F.R. § 1508.13. Here, defendants prepared an EA which culminated in a FONSI, and an EIS was not prepared. Decision Record, Pls.' Ex. 18, ECF No. 14-18 at 2. Agencies must also consider the "cumulative impact" of a proposed project, which may result from "individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7.

Judicial review of agency actions under NEPA is governed by the APA. 5 U.S.C. §§ 706 et seq.; *see also San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014). Under the APA, the reviewing court must uphold an agency decision unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Such review is "deferential and narrow, establishing a high threshold for setting aside agency action." *River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1067 (9th Cir. 2010). In order to meet this burden, agencies must present a "rational connection between the facts found and the conclusions made." *Oregon Nat. Res. Council Fund v. Brong*, 492 F.3d 1120, 1125 (9th Cir. 2007). On the other hand, an agency's decision is arbitrary and capricious if it was not "based on a consideration of the relevant factors" or if there was a "clear error of judgment." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). A reviewing court is required to "engage in a

1   substantial inquiry of the agency's action." *Friends of Animals*, 2015 WL 555980, at \*2 (citation

2   omitted).

3              a.   Plaintiffs fail to show a likelihood of success on the merits for their NEPA

4                   claims.

5        Applying this deferential standard to plaintiffs' motion, I find that they fail to

6   demonstrate a likelihood of success on the merits of their underlying NEPA claims. Plaintiffs

7   argue broadly that the EA fails to address a number of site and project-specific impacts in

8   violation of NEPA's "hard look" requirement. I consider each of plaintiffs' arguments in turn.

9              i.   The EA included site-specific impacts.

10       Plaintiffs argue first that the BLM violated NEPA's "hard look" requirement because the

11  EA lacks "any" site-specific analysis. ECF No. 14 at 12–15. While NEPA permits an agency to

12  broadly forecast cumulative impacts at the early stages of a project, once a project is in its

13  implementation stage—as the instant Project is—NEPA requires a more narrow and detailed

14  review of the impacts on "individual site-specific projects." *Friends of Yosemite Valley v. Norton*, 348

15  F.3d 789, 800–01 (9th Cir. 2003) (cleaned up). Plaintiffs' complaints here are without merit.

16  While they argue that "the Project adopts an integrated, broad-scale vegetation removal

17  program over a 384,414-acre area while deferring critical decisions about siting and treatment

18  methods to the future with no additional NEPA review" (ECF No. 14 at 12–13), the record shows

19  otherwise. Indeed, the EA directly addresses how and where treatments will occur. *See* EA, Defs.'

20  Ex. 5, ECF No. 15-5 at 11–14, 69. Specifically, it describes the maximum number of acres to be

21  treated; percentage of vegetation to be treated; and divides the watersheds into thirteen

22  treatment units, categorizing each unit into one of four treatment categories based on the

23  vegetative conditions and treatment objectives. *Id.*

24       Next, plaintiffs complain that the "EA's description of the affected environment is

25  similarly vague, lacking critical details necessary for evaluating the project's site-specific

26  environmental impacts" and in some sections is simply a recitation of general characteristics

common to valleys throughout Nevada and the Great Basin. ECF No. 14 at 13. But plaintiffs seek to expand what is actually required to be in an EA. In *Navickas v. Conroy*, the Ninth Circuit approved a similar treatment method and description to that of the instant Project. 575 F. App'x 758, 760 (9th Cir. 2014). In that case, the plaintiff sued the U.S. Forest Service for violating the "hard look" NEPA requirement in its approval of a project by allegedly failing to disclose the "location, spatial arrangement, timing, [or] intensity of the proposed vegetation treatments and connected actions" within the EIS. *Navickas v. Conroy*, 2012 WL 7176793, at *60 (D. Or. Sept. 7, 2012), *report and recommendation adopted in part, rejected in part*, 2013 WL 686825 (D. Or. Feb. 25, 2013), *aff'd in part, rev'd in part and remanded*, 575 F. App'x 758. Like the BLM project here, the Forest Service's project in *Navickas* identified four treatment categories, and explained which treatments would be applied in each area based on the vegetative conditions. *Id.* Although the EIS in *Navickas* did not describe the location of the proposed treatments in detail, the court found that its use of maps showing where proposed treatments would occur was sufficient to explain where and to what extent treatments would occur, in satisfaction of the hard look requirement. *Id.* at *138–139 (reasoning "NEPA does not require that every implementing action of a proposed project be set forth and analyzed in detail, even in a sire-specific EIS") (citing *Env't Def. Fund, Inc. v. Andrus*, 619 F.2d 1368, 1376 (10th Cir. 1980)). Similarly, here, the EA contains a map of vegetation restoration units, EA, Defs.' Ex. 5, ECF No. 15-5 at 70 (map 3), as well a table with treatment specific objectives per treatment unit, *id.* at 12–14 (table 2.2). This is sufficient, particularly for an EA and FONSI which require *less* detail than the EIS analysis that the Ninth Circuit in *Navickas* approved.

Plaintiffs next argue that the EA's assertion that "any treatment could be implemented in any unit" is evidence that the BLM is using broad, rather than site-specific analysis as to where, when, or how treatments will be conducted. ECF No. 14 at 13. Plaintiffs, however, ignore that this statement was made in the context of an adaptive management plan. *See* EA, Defs.' Ex. 5, ECF No. 15-5 at 11 ("While primary treatments are listed, any treatment could be implemented

in any unit *as part of adaptive management process.*") (emphasis added). Adaptive management "is a decision-making process that promotes flexible decision making that can be adjusted in the face of uncertainties as outcomes from management actions and other events become better understood[,]" *id.* at 110, and is permitted by NEPA. *Protect Our Communities Found. v. Jewell*, 825 F.3d 571, 582 (9th Cir. 2016). The EA states that given the long-term objectives and implementation period of the Project, adaptive management will be utilized to achieve the objectives set forth for a restoration unit when a primary restoration method fails to do so. EA, Defs.' Ex. 5, ECF No. 15-5 at 110–11. Plaintiffs cannot expect the EA to provide details of how, when, or where adaptive treatment plans will occur as they are remedies, not planned measures. *See id.* ("The primary restoration method listed would be the core restoration method conducted; however, secondary restoration methods could be selected in lieu of the primary restoration method if it is determined through monitoring, treatment experience, and site-specific objectives that the secondary restoration methods could better meet project objectives.").

Plaintiffs' specific complaint that the EA fails to address the impact the treatments may have on "soil crusts" is unsupported. NEPA permits EAs to include "'[t]iering, or avoiding detailed discussion by referring to another document containing the required discussion' and 'tiered analyses[,]' so long as the tiered-to document has been subject to NEPA review. *Western Watersheds Project v. Lueders*, 122 F. Supp. 3d 1039, 1047 (D. Nev. 2015) (citations omitted), *aff'd sub nom. W. Watersheds Project v. Ruhs*, 701 F. App'x 651 (9th Cir. 2017). Only where neither the general nor the site-specific documents address significant issues is environmental review rejected." *Id.* (citing *Te-Moak Tribe of W. Shoshone of Nevada v. U.S. Dep't of Interior*, 608 F.3d 592, 602–07 (9th Cir. 2010). Here, the EA tiers to site-specific analyses and related effects disclosed in eight documents that were subject to NEPA review, including an analysis on the potential impacts of the Project on soil crusts. *See* EA, Defs.' Ex. 5, ECF No. 15-5 at 124 (the EA states that the "[e]ffects to biological soil crusts are analyzed in the Programmatic EIS for Fuel Breaks in the Great Basin (USDIBLM 2020a) and Programmatic EIS for Fuels Reduction and Rangeland

Restoration in the Great Basin (USDIBLM 2020b) which are tiered to this EA."); *see also id.* at 125 (the EA states that "[t]e EA is tiered to larger EISs that are programmatic in nature."); *id.* at 9–10 (listing the tiered to documents). Moreover, the EA does directly address in detail the Project's impact on soil, as well as on fire, wildlife, special status species, and vegetation conditions. *See* Defs.' Ex. 5, EA, ECF No. 15-5 at 22, 25–27, 30–32, 34, 36, 38–40, 43–47, 68–85.

ii.   The EA included habitat-or species-specific analyses of the Project's impacts.

While plaintiffs allege the EA is bereft of any "habitat-or species-specific analysis regarding the Project's likely impacts" "apart from a discussion about the purported benefits of treatments generally apart from a discussion about the purported benefits of treatments generally," ECF No. 14 at 13, this is unfounded.

Under NEPA, "the purpose of an [EA] is simply to create a workable public document that briefly provides evidence and analysis for an agency's finding regarding an environmental impact." *Tri-Valley CAREs v. U.S. Dep't of Energy*, 671 F.3d 1113, 1129 (9th Cir. 2012). An agency need not "compile an exhaustive examination of each and every tangential event that potentially could impact the local environment. Such a task is impossible, and never-ending." *Id.* In producing an EA, an agency must only "provide the public with sufficient environmental information, considered in the totality of the circumstances, to permit members of the public to weigh in with their views and thus inform the agency decision-making process." *Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938, 953 (9th Cir. 2008). "The court is not to 'act as a panel of scientists that instructs the [agency] . . ., chooses among scientific studies . . ., and orders the agency to explain every possible scientific uncertainty.'" *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1075 (9th Cir. 2011) (quoting *The Lands Council v. McNair*, 537 F.3d 981, 988 (9th Cir. 2008)).

Here, EA chapter 3 analyses the affected environment and environmental consequences the Project will impose. EA, Defs.' Ex. 5, ECF No. 15-5 at 21–51. The EA discusses the magnitude

of potential effects on habitats and species including soil resources, vegetation resources, fire management, wildlife, migratory birds, special status species, wetlands/riparian zones, lands with wilderness characteristics, visual resource management, livestock management, and wild horses. *Id.* It describes effects as major, moderate, minor, negligible, or no effect, and whether the effect would be short term (less than 10 years) or long term (greater than 10 years). *Id.* at 21–22. Another example of habitat-or-species-specific analysis is sagebrush treatments. *See id.* at 27–28. BLM determined that treatment within sagebrush habitats needed to be tailored depending on the potential environmental effect. *Id.* For instance, in sagebrush habitat where pinyon and juniper trees have become established, the trees will be removed to allow for increased herbaceous and sagebrush growth. *Id.* at 27. Whereas in sagebrush habitat where sagebrush density cover is extremely high, shrub cover will be reduced to help increase vigor of shrubs and to reduce competition to existing grasses and forbs. *Id.* While the EA's habitat specific analysis may not meet plaintiffs' expectations, it does contain habitat specific analysis.

Additionally, the Ninth Circuit has allowed agencies to rely on outside studies and other resources of data in making its findings. *Kern Cnty. Farm Bureau v. Allen*, 450 F.3d 1072, 1080–81 (9th Cir. 2006). Here, the EA tiers to the Ely FEIS, *id.* at 7, which discusses habit-and-species-specific goals and impacts in detail. *See, e.g.*, Ely Proposed Resource Management Plan / Final Environmental Impact Statement (Ely FEIS), Defs.' Ex. 2, ECF No. 15-2 at 25 (listing goals to provide habitat for fish and wildlife, and associated impacts). It also incorporates the ARMPA's sage-grouse habitat objectives in the design of habitat restoration projects and to manage treated areas to meet sage-grouse habitat objectives. EA, Defs.' Ex. 5, ECF No. 15-5 at 90. Plaintiffs also argue that the EA's analysis of the impacts on individual special status species of the pygmy rabbit and pinyon jay is deficient.[7] ECF No. 14 at 14. Specifically, they argue that the EA gives only a cursory description of how pinyon-juniper removal "could" affect the pinyon jay,

---

[7] This analysis does not address plaintiffs' claim that the EA and Decision Record contravene the RMP's requirement to replace the lost habitat of special status species, which is discussed *infra*.

with no discussion of the impacts that the Project may have on their nesting or foraging habitat. *Id.* (citing EA, Defs.' Ex. 5, ECF No. 15-5 at 40). Plaintiffs also take issue with EA's observation that the "[e]xpanded sagebrush vegetation would increase breeding, nesting, and foraging habitat for sagebrush obligate species such as … pygmy rabbit[,]" while overlooking the fact that one of the Project's "main objectives" is to *reduce* sagebrush. *Id.* (citing EA, Defs.' Ex. 5, ECF No. 15-5 at 39). Plaintiffs ignore, however, that the Project builds in pinyon jay conservation measures: namely, that the BLM must coordinate with the Nevada Department of Wildlife to "ensure proper placement and design of treatments that may affect pinyon jay's habitat[,]" which, to comply, requires the BLM to consider pinyon jay habitat suitability when choosing areas for treatment. ECF No. 15 at 20 (citing EA, Defs.' Ex. 5, ECF No. 15-5 at 105). Indeed, the Project does far more than recite that treatments "could" harm the pinyon jay: it takes active measures to avoid harm based on the potential impact treatments may have to the pinyon jay's habitat.

Plaintiffs' also overlook the Project's design features that minimize the effect of habitat fragmentation on sagebrush species such as the pygmy rabbit when revegetation is still in progress. Indeed, the EA seeks to avoid pygmy rabbit habitats *altogether* for most treatments, and where it cannot be avoided, the BLM is required to survey for burrows and colonies before implementations so they can be circumvented. *Id.* at 19–20 (citing EA, Defs.' Ex. 5, ECF No. 15-5 at 106.) The EA further considers how other special status species will be affected. *Id.* at 57–58; 87–88; 106–07.

iii.  The EA analyzed the cumulative impact of livestock grazing.

Plaintiffs also argue that the EA insufficiently analyzes the cumulative impacts of livestock grazing. ECF No. 14 at 16–17. I disagree. A cumulative impact is "the impact on the environment which results from the incremental impacts of the action when added to other past, present, and reasonably foreseeable future actions." *Montana Wilderness Ass'n. v. Connell*, 725 F.3d 988, 1001 (9th Cir. 2013) (quoting 40 C.F.R. § 1508.7). NEPA requires agencies' cumulative

impact analysis to contain some quantified or detailed information but allows agencies to "characterize the cumulative effects of past actions in the aggregate without enumerating every past project that has affected an area." *Ctr. for Env't Law & Pol'y v. U.S. Bureau of Reclamation*, 655 F.3d 1000, 1007 (9th Cir. 2011). This may be accomplished in the EA itself or by tiering. *Ruhs*, 701 F. App'x at 653–54.

Here, the EA discusses cumulative effects and contains a cumulative effects analysis. EA, Defs.' Ex. 5, ECF No. 15-5 at 53–62. Not only does the EA analyze the cumulative impacts of livestock grazing (*id.* at 60–61), but it also appropriately tiers to a BLM document that does so. *Id.* at 53 (tiering to section 4.28 of the Ely District Record of Decision and Approved Resource Management Plan). For example, the EA addresses the potential cumulative impacts of surface disturbances, such as roads and trails, that may have altered or removed vegetation that would otherwise be available for livestock grazing. *Id.* at 60. The EA also discusses "foreseeable actions within the CESA (Cumulative Effects Study Area) that would affect livestock grazing". *Id.* at 61.

The Project's analysis of the potential cumulative impact of livestock management generally, and within it livestock grazing, satisfies NEPA's required hard look requirement and created an EA that "provide[d] a reasonably thorough discussion of the significant aspects of the probable environmental consequences." *350 Montana v. Haaland*, 29 F.4th 1158, 1169 (9th Cir. 2022).

"Plaintiffs want Defendants to go above and beyond to produce an EA that considers every possible risk, but '[t]he EA is not an exhaustive examination of every possible environmental event.'" *Tahoe Cabin, LLC v. Fed. Highway Admin.*, 2022 WL 19296773, at *3 (D. Nev. Oct. 4, 2022) (quoting *Friends of the Wild Swan v. Weber*, 767 F.3d 936, 942 (9th Cir. 2014)). Indeed, the purpose of an EA is to determine whether an EIS is required and does not need to conform to the more in-depth analysis of an EIS. *Found. for N. Am. Wild Sheep v. U.S. Dep't of Agr.*, 681 F.2d 1172, 1183 n.29 (9th Cir. 1982) ("We do not suggest that the EA must conform to all the requirements of an EIS. We merely assess whether the EA, offered by the [agency] as the prime statement of

1   reasons for its decision not to prepare an EIS, is sufficient to establish the reasonableness of that

2   decision."). In fact, an EA—by its very nature—is a "concise public document," 40 C.F.R. §

3   1508.11, intended to "[b]riefly provide sufficient evidence and analysis for determining whether

4   to prepare an" EIS or FONSI. *Id.* at § 1508.9(a)(1). An EA and corresponding FONSI, as produced

5   in the case here, are indicative that an action "will not have a significant effect." 40 C.F.R. §

6   1508.13. Conversely, an EIS is a "detailed written statement," *Id.* at § 1508.11, intended to "provide

7   full and fair discussion of significant environmental impacts and shall inform decisionmakers

8   and the public of the reasonable alternatives which would avoid or minimize adverse impacts or

9   enhance the quality of the human environment." 40 C.F.R. § 1502. Plaintiffs argue that the BLM

10  did not adequately address the environmental impacts of the Project, yet curiously failed to

11  challenge the failure to prepare an EIS, which requires a more in-depth analysis. *See, i.e., W.*

12  *Watersheds Project v. Perdue*, 2023 WL 6377287, at *29 (D. Ariz. Sept. 29, 2023) (Western

13  Watersheds Project challenged an agencies failure to prepare an EIC because there were "several

14  intensity factors warranting an EIS, including the effects on certain endangered species, the

15  unique characteristics of the area, public safety concerns, and significant cumulative impacts").

16          For the reasons outlined above, plaintiffs do not show a likelihood of success, nor raise

17  any serious questions going to the merits of any of their NEPA claims.

18          2.   FLPMA

19          Plaintiffs also complain that the Project violates FLPMA. In enacting the FLPMA,

20  "Congress declared that it is the policy of the United States to manage the public lands 'in a

21  manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air

22  and atmospheric, water resource, and archeological values.'" *Ctr. for Biological Diversity v. U.S. Dep't*

23  *of Interior*, 581 F.3d 1063, 1075 (9th Cir. 2009) (quoting 43 U.S.C. § 1701(a)(8)). To accomplish

24  this, FLPMA requires the BLM to produce land use plans, which BLM calls Resource

25  Management Plans (RMPs). *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 59 (2004) (citing 43

26  C.F.R. § 1601.0-5(k) (2003)). "While RMPs are 'designed to guide and control future

management actions,' BLM has 'a great deal of discretion in deciding how to achieve compliance with an RMP.'" *Ctr. for Biological Diversity v. U.S. BLM*, 2017 U.S. Dist. LEXIS 137089, at *44 (D. Nev. Aug. 23, 2017) (citation omitted). "This discretion is a necessary function of BLM's task to balance multiple uses for land in a way to best meet the needs of the American people. The BLM may not, however, take actions 'inconsistent with the provisions of a land use plan.'" *Id.* at *44– 45 (citation omitted).

Here, the land use plan in question is the 2008 Ely RMP. ECF No. 14 at 17; Ely RMP, Defs.' Ex. 3, ECF No. 15-3.[8] Plaintiffs claim that the RMP contains three special-status species requirements which were all violated by the Project. ECF No. 14 at 17.

      a.   Plaintiffs fail to show a likelihood of success on the merits on two of their three FLPMA claims.

            i.   The BLM did not adequately address the RMP's requirement to replace lost habitats of special status species at a 2-to-1 ratio.

First, plaintiffs argue that the RMP required the BLM to "[m]itigate all discretionary permitted activities that result in the loss of special status species habitats on a ratio of 2 acres of comparable habitat for every 1 acre of lost habitat" as required by the RMP's special status species management actions—and the BLM failed to do this. *Id.* (citation omitted); Ely RMP, Defs.' Ex. 3, ECF No. 15-3 at 65. They are correct. Neither the Project EA nor the Decision Record address the RMP requirement to replace lost special status species habitat.

Defendants allege that the term "permitted activities" "refers to when a party must apply to the BLM for a permit to use federal land." ECF No. 15 at 24. Defendants further allege that because the Project is a BLM initiative, a permit is not required and is therefore exempt from the 2-to-1 ratio requirement.  ECF No. 15 at 24–25. However, defendants do not cite legal authority

---

[8] The was RMP amended by the 2015 Approved Resource Management Plan Amendment in order to incorporate more robust protections for the greater sage-grouse as it was removed as an Endangered Species Act listing. ECF No. 14 at 6.

in support of this claim, and it is contrary to another court's previous determinations. In *Center for Biological Diversity v. United States BLM*, the court stated "the RMP's requirement that BLM replace certain lost habitats [of special status species] at a 2-to-1 ratio is a clear, binding commitment on the agency." 2017 U.S. Dist. LEXIS 137089, at *45. Thus, BLM must comply with the RMP's requirement to replace lost special species habitat—the requirement is not optional. *See id.*

Alternatively, defendants claim that the RMP requirement to replace lost habitat was satisfied because the Project's purpose is to expand the habitat of special status species. ECF No. 15 at 19. But I agree with my fellow judge: although the RMP does not require the BLM to explain precisely how compliance will occur, it must address the requirement. *Ctr. for Biological Diversity*, 2017 U.S. Dist. LEXIS 137089, at *45–46.

Though plaintiffs do not attempt to address which special status species will be affected in particular, instead, merely arguing that the FLMPA was violated because the Project EA and Decision Record "make no mention whatsoever of this requirement for two-to-one mitigation, and do not discuss mitigation for the Project's adverse impacts at all," ECF No. 14 at 17, I find plaintiffs have sufficiently established a likelihood of success on the merits on demonstrating that the BLM failed to meet the 2-to-1 mitigation ratio requirement in contravention of FLPMA. I therefore address *infra* whether plaintiffs satisfied the remaining *Winter* factors for this claim below. *See infra* part C.

ii.   The BLM considered the habitat needs of bat species.

Second, plaintiffs argue that the BLM failed to analyze the needs of bat species in restoration treatments as required by the Ely RMP. ECF No. 14 at 17–18. Specifically, they complain that the Project does not "identify bat species occurring in the Project area, does not discuss habitat requirements for tree-roosting bats, and does not analyze how the authorized treatments would impact th[is] habitat requirement." *Id.* at 18. But contrary to plaintiffs' assertions, the EA does identify bat species within the Project area and tiers to a document that

describes their habit requirements. EA, Defs.' Ex. 5, ECF No. 15-5 at 115. The EA also considers the potential impact of the treatments on the bat species' habitats. For example, the Project cites the risk treatment may have on tree-roosting bats, acknowledging that they "may be disturbed, displaced, or killed during implementation of vegetation treatments" but noting that "suitable habitat exists adjacent to the treatment areas and the actions should not affect local bat populations." *Id.* at 40.

### iii.  The BLM did not violate the ARMPA proscribed fire requirements in sage-grouse habitats.

Last, plaintiffs argue that the EA violates the Approved Resource Management Plan Amendment (ARMPA), which sets requirements for fuels management in sage-grouse habitats. ECF No. 14 at 18. ARMPA management decision 23 establishes requirements for prescribed fire. Nevada and Northeastern California Greater Sage-Grouse ARMPA (ARMPA), Pls.' Ex. 2, ECF No. 16-2 at 48. Management decision 23's directive plainly states that "if prescribed fire is used in [sage-grouse] habitat," a NEPA analysis and burn plan must be created. *Id.* Plaintiffs allege that the BLM violated this requirement by authorizing prescribed fire without first conducting a NEPA analysis and burn plan. ECF No. 14 at 18. But the ARMPA states that the NEPA analysis and burn plan is required only if prescribed fire is used *within* sage-grouse habitat. ARMPA, Pls.' Ex. 2, ECF No. 16-2 at 48 (emphasis added). And as defendants point out, the BLM would avoid using prescribed fire in sage-grouse habitat, so a burn plan is not required by the ARMPA. ECF No. 15 at 25; Teel Decl., Defs.' Ex. 9, ECF No. 15-9 at ¶¶28–29) (explaining that prescribed fire will not be used in sage-grouse habitats).

Specifically, there are four treatment units where prescribed fire may be used as a treatment, units 10, 11, 12, and 13. EA, Defs.' Ex. 5, ECF No. 15-5 at 13–14. Units 10, 11, and 12 are in the High Elevation Restoration category. *Id.* Unit 10 does not contain sage-grouse habitat and units 11 and 12 contain sage-grouse habitat. *See* Teel Decl., Defs.' Ex. 9, ECF No. 15-9 at ¶29. In 2020, unit 12 experienced a wildfire and would not be considered for prescribed fire. Teel Decl.,

18

Defs.' Ex. 9, ECF No. 15-9 at ¶29. Unit 11 overlaps with approximately 13% of an area mapped as general habitat management, but is heavily covered by trees and thus is not useful as sage-grouse habitat. *Id.* If the BLM finds that sage-grouse habitat exists, the area would not be treated by prescribed fire. *Id.* Unit 13 is the only unit in the prescribed fire restoration category. EA, Defs.' Ex. 5, ECF No. 15-5 at 14. Although the majority of unit 13 is outside sage-grouse habitat, when prescribed fire is proposed for unit 13, BLM plans to conduct additional ground reconnaissance to assess the habitat for sage-grouse. Teel Decl., Defs.' Ex. 9, ECF No. 15-9 at ¶28. Like unit 11, the majority of unit 13 is covered in trees and is not useful as sage-grouse habitat. *Id.* Similarly, BLM will not use prescribed fire as a treatment if it is determined that that the area is sage-grouse habitat. *Id.* Thus, because BLM will not use prescribed fire in sage-grouse habitat, I find that plaintiffs have failed to prove a likelihood of success on the merits regarding the ARMPA.

iv.   Plaintiffs' NEPA claims, and two of three FLMPA claims are disposed.

A movant's failure to show that they are likely to succeed on the merits in a request for preliminary injunction is dispositive. *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015). Plaintiffs here fail to demonstrate the threshold inquiry of likelihood of success on the merits or raise serious questions going to the merits of their NEPA claims and for two of their FLPMA claims. I need not consider the other factors of the preliminary injunction or temporary restraining order analysis for these claims. *See Edge v. City of Everett*, 929 F.3d 657, 663 (9th Cir. 2019). Accordingly, plaintiffs' first FLMPA claim for the replacement of special species habitat is the only claim for which I consider the other factors of the preliminary injunction/TRO analysis.

While plaintiffs have demonstrated a likelihood of success on merits as to 2-to-1 mitigation ratio requirement, to demonstrate that a preliminary injunction is warranted, plaintiffs must establish that they are likely to suffer irreparable harm in the absence of preliminary relief, that balance of equities tips in their favor, and that the injunction is in the public interest. *Winter*, 555 U.S. at 22.

v.   Irreparable harm

In order to obtain a preliminary injunction, a plaintiff must do more than allege a possibility of harm. *Id.* A plaintiff must demonstrate that irreparable injury is likely to ensue in the absence of an injunction. *Id.* "Ongoing harm to the environment constitutes irreparable harm warranting an injunction. When a project may significantly degrade some human environmental fact, injunctive relief is appropriate." *Env't Prot. Info. Ctr. v. Carlson*, 968 F.3d 985, 991 (9th Cir. 2020) (quotation marks and citation omitted). As explained below, I find that plaintiffs have failed to show irreparable harm.

To start, plaintiffs do not attempt to argue the surviving claim, RMP's requirement to replace lost species habitat, will cause irreparable injury. *See generally* ECF No. 14 at 20–22. As a result, plaintiffs have not satisfied *Winter*, which requires plaintiffs to present specific, non-speculative evidence that they will be irreparably harmed in the absence of an injunction. *See Winter* 555 U.S. at 20; *Cottrell*, 632 F.3d at 1135 ("*Winter* tells us that plaintiffs may not obtain a preliminary injunction unless they can show that irreparable harm is likely to result in the absence of the injunction."). In short, plaintiffs have failed to carry their burden of showing that the surviving claim will cause irreparable harm by defendants' implementation of the Project. Nonetheless, I address plaintiffs' irreparable harm claims regarding habitat destruction in general, as it may contain special species habitat affected by the RMP requirement.

Plaintiffs allege that absent a preliminary injunction/TRO, they will likely suffer irreparable harm due to the destruction of up to 2,000 acers of woodland caused by chaining. ECF No. 14 at 20–22.[9] First, plaintiffs claim that chaining will harm their members' interest in the woodlands and the wildlife species that depend on them. *Id.* While I recognize that members' loss of the ability to view, experience, and use undisturbed forested land may constitute irreparable harm, *Cottrell*, 632 F.3d at 1136, members' interest in viewing an

---

[9] Plaintiffs' claims for irreparable harm from NEPA violations (ECF No. 14 at 22–23) are not discussed for reasons described *supra* in Section B.

"undisturbed landscape" is insufficient to establish a likelihood of irreparable harm when plaintiffs' "allegations as supported by their evidence are too speculative to demonstrate a concrete and particularized harm that creates an irreparable injury in light of defendants' conflicting arguments and evidence that demonstrate their consideration of environmental impacts." *All. for the Wild Rockies v. Pena*, 2016 WL 6123236, at *3 (E.D. Wash. Oct. 19, 2016), *aff'd*, 865 F.3d 1211 (9th Cir. 2017).

Here, as defendants argue, the Ely RPM, FRR FEIS, and ARMPA all show that BLM's goals of restoring sagebrush communities and associated habitat could not be achieved without removing encroaching pinyon and juniper trees. ECF No. 15 at 26–27; *see* FRRR FEIS, Defs.' Ex. 1, ECF No. 15-1 at 35; *see also* ARMPA Defs.' Ex. 4, ECF No. 15-4 at 30, 49, 51. And similarly shows that defendants considered the environmental impact of chaining. *See e.g.*, Teel Decl., Defs.' Ex. 9, ECF No. 15-9 at ¶¶19–25. Chaining will only occur within sagebrush communities where pinyon and juniper trees have become established, which is not considered true or historic pinyon juniper woodland. *Id.* at ¶16. In consultation with Nevada Department of Wildlife (NDOW) and using the Great Basin Pygmy Rabbit Habitat model, BLM determined that the chaining treatment areas was not likely pygmy rabbit habitat. *Id.* at ¶17. BLM further determined that the proposed chaining area receives little to no sage-grouse use and that is not considered high-quality pinyon jay habitat. *Id.* at ¶¶17–18. "Delaying implementation of the Project will allow the establishment of pinyon and juniper trees to continue, further reducing the sagebrush community. This will continue to reduce usable habitat for the sage-grouse and other sagebrush-obligate species." *Id.* at ¶25.

Thus, while the ability of visitors to enjoy the woodlands would likely be interfered with if the injunction is denied, the weight of that concern, its substance, cannot compare to that of a legitimate plan set forth in the Project. Consequently, plaintiffs' claims cannot support a preliminary injunction in light of defendant's evidence that they considered the environmental impacts of chaining. *See Pena*, 2016 WL 6123236, at *3.

I am also not persuaded by plaintiffs' second argument that chaining will create an environment for cheatgrass invasion which may lead to an increase of wildfire (*Id.* at 22). The record indicates that prior treated areas have experienced an *increase* of cheatgrass, Teel Decl., Defs.' Ex. 9, ECF No. 15-9 at ¶¶21–22, while nearby untreated areas have been *invaded* by cheatgrass (Coombs Decl., Defs.' Ex. 10, ECF No. 15-10 at ¶7) (emphasis added), which supports implementation of the project. As defendants point out, the EA acknowledges the risk of cheatgrass and identifies measures for its treatment if necessary, including pre-treatment identification, post-treatment monitoring, seeding, and herbicide application if necessary. Teel Decl., Defs.' Ex. 9, ECF No. 15-9 at ¶22. Thus, plaintiffs' concerns regarding wildfire caused by cheatgrass growth due to chaining are unlikely, and thus insufficient as a basis of irreparable harm. *See Cottrell*, 632 F.3d at 1135.

vi.   Balance of equities and the public interest

Because a party seeking a preliminary injunction must satisfy all four *Winter* factors or the sliding scale standard for injunctive relief, *Cottrell*, 632 F.3d at 1135, I need not address the remaining two factors. *Pena*, 865 F.3d at 1223. Therefore, I find that plaintiffs have failed to carry their burden of demonstrating why a preliminary injunction or temporary restraining order should issue in this case.

**IV. Conclusion**

IT IS HEREBY ORDERED that plaintiffs' motion for preliminary injunction **[ECF No. 14]** and motion for temporary restraining order **[ECF No. 17] are DENIED.**

DATED: October 18, 2023

_____
Cristina D. Silva
United States District Judge