UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

| | |
|---|---|
| Western Watersheds Project, et al.,<br><br>Plaintiffs<br><br>v.<br><br>U.S. Department of the Interior, et al.,<br><br>Defendants | Case No. 2:23-cv-00435-CDS-DJA<br><br>**Order Denying Plaintiffs' Motion for Summary Judgment and Granting Defendants' Motion for Summary Judgment**<br><br>[ECF Nos. 25, 26] |

Plaintiffs Western Watersheds Project and the Center for Biological Diversity bring this action against defendants U.S. Department of the Interior, Bureau of Land Management, Jared Bybee in his official capacity as Field Manager of the Bureau of Land Management Bristlecone field office, and Shirley Johnson in her official capacity as Field Manager of the Bureau of Land Management Caliente field office, to stop the implementation of the South Spring Valley and Hamlin Valley Watersheds Restoration Project (hereinafter referred to collectively as "the Project"). Compl., ECF No. 1. Plaintiffs argue that the Project's environmental assessment violates the Administrative Procedure Act (APA), National Environmental Policy Act (NEPA), and the Federal Land Policy and Management Act (FLPMA). *Id.* at 40, 41. On March 22, 2024, plaintiffs filed a motion for summary judgment. Pls.' mot. for summ. j., ECF No. 25. Defendants filed a response to the motion for summary judgment, which was also its own cross-motion for summary judgment. Defs.' mot. for summ. j., ECF No. 26.[1] I held oral argument on the motions on February 19, 2025. ECF No. 33. For the reasons herein, I grant defendants' motion for summary judgment and deny plaintiffs' motion for summary judgment.

---

[1] At the hearing I cautioned defendants that the combined response and countermotion violates Local Rule IC 2-2(b). Defendants were advised that future violations of the local rules may result in sanctions.

### I. Background

On October 18, 2023, I denied plaintiffs' motion for preliminary injunction and motion for temporary restraining order. Order, ECF No. 19. I incorporate by reference, as if set forth fully herein, the facts presented in that order.

### II. Legal standard

Summary judgment is appropriate when the pleadings and admissible evidence "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)). At the summary-judgment stage, the court views all facts and draws all inferences in the light most favorable to the nonmoving party. *Kaiser Cement Corp. v. Fishbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986). If reasonable minds could differ on material facts, summary judgment is inappropriate because its purpose is to avoid unnecessary trials when the facts are undisputed; the case must then proceed to the trier of fact. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995); *see also Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994).

Once the moving party satisfies Rule 56 by demonstrating the absence of any genuine issue of material fact, the burden shifts to the party resisting summary judgment to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Celotex*, 477 U.S. at 323. "To defeat summary judgment, the nonmoving party must produce evidence of a genuine dispute of material fact that could satisfy its burden at trial." *Sonner v. Schwabe N. Am., Inc.*, 911 F.3d 989, 992 (9th Cir. 2018). "When simultaneous cross-motions for summary judgment on the same claim are before the court, the court must consider the appropriate evidentiary material identified and submitted in support of"—and against—"both motions before ruling on each of them." *Tulalip Tribes of Wash. v. Washington*, 783 F.3d 1151, 1156 (9th Cir. 2015) (citing *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1134 (9th Cir. 2001)).

III.     Discussion

      **A. Plaintiffs' motion for summary judgment is denied and defendants' motion for summary judgment is granted.**

Defendants' motion for summary judgment also operates as its response to plaintiffs' motion for summary judgment. ECF No. 26. Therefore, I address both motions simultaneously. In their motion, plaintiffs argue that the Project violates both the FLPMA and NEPA. I address each statute in turn.

              *1. The Project does not violate FLPMA.*

When Congress enacted the FLPMA it declared that "it is the policy of the United States to manage the public lands 'in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource and archeological values.'" *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 581 F.3d 1063, 1075 (9th Cir. 2009) (quoting 43 U.S.C. § 1701(a)(8)). To effectuate this, FLPMA requires the BLM to produce land use plans known as Resource Management Plans (RMPs). *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 59 (2004) (citing 43 C.F.R. § 1601-5(k) (2003)). "While RMPs are 'designed to guide and control future management actions' BLM has 'a great deal of discretion in deciding how to achieve compliance with an RMP." *W. Watersheds Project v. United States DOI*, 2023 U.S. Dist. LEXIS 186760, at *24 (D. Nev. Oct. 18, 2023) (citing *Ctr. for Biological Diversity v. United States BLM*, 2017 U.S. Dist. LEXIS 137089, at *44 (D. Nev. Aug. 23, 2017)). Despite this discretion, BLM may not "take actions 'inconsistent with the provisions of a land use plan.'" *Ctr. for Biological Diversity*, 2017 U.S. Dist. LEXIS 137089, at *43–44 (quoting *Norton*, 542 U.S. at 69). The RMP at issue here is the 2008 ELY RMP, AR_03776–04254, as amended by the 2015 Approved Resource Management Plan Amendments (ARMPAs), AR_08634–08737. Plaintiffs argue that the Project violates FLPMA because it violates the land use plan by failing to comply with the ELY RMP's three special-status species requirements. ECF No. 25 at 18–27.

### a. *BLM adequately addresses the RMP's requirement to replace lost habitats of special status species at a two-to-one ratio.*

The ELY RMP requires BLM to "mitigate all discretionary permitted activities that result in the loss of special status species habitats on a ratio of two acres of comparable habitat for every one acre of lost habitat as determined on a project-by-project basis." AR_03839. At issue is the meaning of the term "permitted activities." Plaintiffs argue that BLM has violated FLPMA because it failed to comply with this 2:1 mitigation requirement. BLM concedes that it does not apply the 2:1 mitigation requirement but claims that this project is exempt from the 2:1 mitigation requirement because "permitted activities" as used in the ELY RM applies only "when a party must apply to the BLM for a permit to use the land." ECF No. 25 at 18. Plaintiffs argue that this is incorrect because the term "permitted activities" does not mean "with a permit" but instead unambiguously means "with permission." *Id.* at 19. To support their argument that the term "permitted activities" means with permission, plaintiffs point to the fact that the Environmental Impact Statement (EIS), which accompanies the ELY RMP, "specifically refers to treatment as a permitted activity." *Id.* (citing AR_02486 which states "[c]lose sensitive areas to recreational, development, treatment, and other permitted activities during sensitive periods," and AR_02659 which states "temporal restrictions are used to restrict recreation, development, treatment, and other permitted activities during sensitive breeding and seasonal periods for wildlife"). Further, plaintiffs argue that even if the term is ambiguous, it is still not entitled to deference because BLM's interpretation of the term "permitted activities" does not reflect "fair and considered judgment." *Id.*

In their response/cross-motion, defendants argue that, using tools of statutory construction, the ELY RMP "reveals that the term 'permitted activities' unambiguously refers to non-BLM activities that require a permit." ECF No. 26 at 32. To support their argument, defendants point to a provision in the RMP that says "[a] BLM representative(s) will be designated and will be responsible for overseeing compliance with terms and conditions of **all**

**permitted activities** and reporting requirements. The designated representative will provide coordination among the **permitee**, project proponent, the BLM and the U.S. Fish and Wildlife Service." *Id.* at 32–33 (citing AR_03843) (emphasis in original). Defendants surmise that

> [i]f "all"—not some, but *all*—"permitted activities" require a "designated representative" from BLM to coordinate with the "permittee," it follows that a "permitted activity" must always involve some type of permit. BLM does not issue permits to itself, so vegetation treatments and other management actions do not qualify.

*Id.* at 33. Defendants also point out that when the RMP refers to BLM's own management actions or approved activities in general it uses different language. *Id.* (citing AR_03800; AR_03822; AR_03943 ("resource management activities" "authorized activities" and "BLM-approved activities")). Further, defendants argue that excluding BLM actions from the scope of "permitted activities" is consistent with the FLPMA "which uses the word 'permitted' exclusively to reference non-federal uses for land that require a permit." *Id.* at 33 (citing 43 U.S.C. §§ 1732(b), 1752(e), 1769(a) and 1785(c)(3)). Lastly, defendants argue that even if I find that the term "permitted activities" is ambiguous, defendants argue they are entitled to deference under *Kisor v. Wilkie*. *Id.* at 35 (citing 588 U.S. 558, 574 (2019)).

The Supreme Court has held that, when interpreting an agency's own regulations, a court should afford the agency deference. *Auer v. Robbins*, 519 U.S. 452, 461 (1997). The Court in *Kisor* clarified *Auer* deference and explained that "a court should not afford *Auer* deference unless the regulation is genuinely ambiguous." 588 U.S. at 575. Before concluding that an agency's rule is "genuinely ambiguous," "a court must exhaust all the 'traditional tools' of construction." *Id.* To properly determine if a regulation is ambiguous, "a court must carefully consider[] the text, structure, history, and purpose of a regulation, in all ways it would if it had no agency to fall back on. *Id.* (citing *Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 707 (1991) (Scalia, J., dissenting)).

5

Looking at the entire record, I find that the term "permitted activities" unambiguously refers to non-BLM activities that require a permit. It is most telling that the RMP makes mention of "permitted activities" and, in the same paragraph, discusses "permitees." *See* AR_03843. The Administrative Record also includes a "Preliminary EA **Permitee** Mailing List." AR_13098 (emphasis added). Further, the administrative record also demonstrates that BLM uses different language, such as "resource management activities," "authorized activities," and "BLM-approved activities" when it refers to its own management or approved activities. *See* AR_03800; AR_03822; AR_03943. "Permitted" thus refers to activities that require a permit and does not mean generally permission. Additionally, as defendants argue, finding that "permitted" means "requires a permit" is also consistent with the FLPMA. *See* ECF No. 26 at 33 (citing 43 U.S.C. §§ 1732(b), 1752(e), 1769(a) and 1785(c)(3)). As a result, I find that "designated permitted activities" unambiguously means "those that require a permit" and the RMP's requirement to "mitigate all discretionary permitted activities" at a 2:1 ratio does not apply to BLM.[2]

### b. *BLM adequately considered the habitat needs of tree roosting bats.*

Plaintiffs argue that the RPM violates the FLPMA because BLM ignored the ELY RMP's requirement to "consider the habitat needs of obligate bat species in restoration treatments" "especially in riparian areas and pinyon-juniper woodlands." ECF No. 25 at 21 (citing AR_03839). The Environmental Impact Statement identifies numerous bat species that are in the planning area, and fifteen of these species are identified as BLM sensitive species. AR_02207. However, plaintiffs argue BLM did not consider the habitat needs of any of these bats before authorizing the project because the record contains no information on bat habitats in the Project area, and the Environmental Assessment (EA) offers only a short, conclusory, and speculative discussion regarding impacts to individual bats that does not consider any specific species' habitat needs: "Tree roosting bats may be disturbed, displaced, or killed during implementation of vegetation treatments however, suitable habitat exists adjacent to the treatment areas and the

---

[2] Because I find that the agency rule is unambiguous, I do not address the second *Kisor* step.

actions should not affect local bat populations." *Id.* at 21–22 (citing AR_13742). Plaintiffs believe this statement is inadequate to demonstrate compliance with the RMP. *Id.* at 22.

In their cross-motion/response, defendants argue that the RPM does properly consider the habitat needs of bat species in the restoration treatment because the EA "identif[ies] bat species within the Project area and tiers to a document"—the Ely Final EIS (FEIS)—"that describes their habit requirements." ECF No. 26 at 39 (citing AR_13818; AR_02433). Defendants also argue that "[t]he EA also acknowledges that 'tree-roosting bats,' i.e., woodland obligate species . . . 'may be disturbed, displaced, or killed during implementation of vegetation treatments[;] however, suitable habitat exists adjacent to the treatment areas and the actions should not affect local bat populations." *Id.* (citing AR_13742). Lastly, defendants argue that "[t]ree removal treatment units where tree-roosting bats could be impacted are characterized almost entirely by 'pinyon-juniper woodland' communities, and the Project's staggered implementation ensures that there will be woodland habitat remaining around any specific implementation." *Id.* (citing AR_13772; AR_13776).

I find that defendants have adequately considered the habitat needs of tree roosting bats. The RMP identifies the bat species and tiers to a document that discusses their habitat requirements, *see* AR_13818 and AR_02433, before explaining what could happen to the bats as a result of the project. AR_13742 ("Tree roosting bats may be disturbed, displaced, or killed during implementation of vegetations treatments, however **suitable habitat exists adjacent to the treatment areas and the actions should not affect local bat populations.**" (emphasis added)). Further, at the hearing, plaintiffs agreed that BLM will stagger the removal plan so that not all the trees the bats rely on will be removed at once.[3] The BLM retains "'a great deal of discretion in deciding how to achieve'" compliance with the applicable land use plan. *Klamath Siskiyou Wildlands Ctr. v. Gerritsma*, 962 F. Supp. 2d 1230, 1234 (D. Or. 2013) *aff'd*, 638 F. App'x 648 (9th Cir.

---

[3] *See* AR_13713 ("The type of treatment within each unit varies depending on the successional phase of the existing vegetation and the desired range of conditions.")

2016) (quoting *Norton*, 542 U.S. at 66). Given that discretion, and the record before me, I find that BLM adequately considered the habitat needs of tree roosting bats.

### c. *BLM's authorization of prescribed fire in greater sage-grouse habitat does not violate ARMPA.*

Fire poses a serious threat to greater sage-grouse and their sagebrush habitats. ECF No. 25 at 24. As such, the 2015 ARMPA places significant restrictions on the use of prescribed fire. *Id.* The ARMPA says that if "prescribed fire is used" in sage-grouse habitat BLM must prepare a burn plan and a NEPA analysis explaining (1) "why alternative techniques were not selected as a viable option," (2) how sage-grouse "habitat management goals and objectives would be met by its use," (3) "how the [Conservation Objective Team] report objectives will be addressed and met," and provide (4) a risk assessment addressing "how potential threats to [sage grouse] habitat would be minimized." AR_08680; *see* AR_08774 (same). Plaintiffs argue RMP violates the FLPMA because, although it authorizes the use of prescribed fire in sage-grouse habitats, BLM did not prepare either a burn plan or a NEPA analysis. ECF No. 25 at 26–27. In their cross-motion/response, defendants explain that the EA contains "no concrete plans to use prescribed fire" in sage-grouse habitat. ECF No. 26 at 40. Defendants conclude that the burn plan and NEPA analysis are not required yet because the AMPRA is triggered when prescribed fire "*is used.*" *Id* (citing AR_08680). BLM explains that if any prescribed fire implementation overlaps with sage-grouse habitat, BLM would prepare supplemental NEPA analysis to address the AMPRA requirements. *Id.* at 41.

Because there are no concrete plans to use prescribed-fire in the sage-grouse habitat, the AMPRA requirements have not been triggered. Courts in this circuit have recognized that BLM is permitted to conduct further NEPA analysis after an EA or an EIS has been prepared in circumstances where a substantial change is made that "affect[s] the environment to the proposed action." *See W. Watersheds Project v. Salazar*, 766 F. Supp. 2d 1095, 1106 (D. Mont. 2011), *aff'd in part*, 494 F. App'x 740 (9th Cir. 2012). Further, in compliance with the AMPRA, the EA

does require BLM to create project-specific burn plans when prescribed fire is used. *See* AR_13725 ("[A]n established project-specific burn plan would be developed at the time of implementation to lessen the effects."); AR_13734 ("A comprehensive burn plan would be required for all prescribed fire treatments, which would establish control measures and contingency plans to minimize risks."). Therefore, as there are no concrete plans to use prescribed fire in the sage-grouse habitat, defendants have not violated the AMPRA.

Plaintiffs fail to demonstrate that defendants have violated FLPMA. Therefore, defendants' motion for summary judgment is granted as to the FLPMA claims. Consequently, plaintiffs' motion for summary judgment as to the FLPMA claims is denied.

### 2. *The Project does not violate NEPA.*

Plaintiffs next argue that the Project violates NEPA. ECF No. 25 at 27. NEPA is this country's national charter for protection of the environment. *'Ilio'ulaokalani Coal. v. Rumsfeld*, 464 F.3d 1083, 1093 (9th Cir. 2006) (citing 40 C.F.R. § 1500.1(a) (2006)). Although NEPA does not impose any direction or restriction on the ultimate action of an agency, *Hillsdale Env't Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs*, 702 F.3d 1156, 1166 (10th Cir. 2012), it requires the agency to take a "hard look" at the potential environmental consequences of a proposed action, *Friends of Animals v. U.S. Bureau of Land Mgmt.*, 2018 WL 1612836, at *11 (D. Or. Apr. 2, 2018) ("Thus, the Ninth Circuit has affirmed that the important question is whether the agency has taken a 'hard look' at the environmental impacts of a proposed action."). A "hard look includes determining whether the agency adequately evaluated all potential environmental impacts of the proposed action, analyzed all reasonable alternatives to the proposed action, and identified and disclosed to the public all foreseeable impacts of the proposed action." *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 2019 WL 236727, at *11 (D. Nev. Jan. 15, 2019) (citing 42 U.S.C § 4332(2)(C)).

To comply with the hard look requirement, NEPA requires federal agencies to prepare a "detailed statement" concerning "every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment."

42 U.S.C. § 4332(2)(C). This statement may take the form of an EA or an EIS. *W. Watersheds Project v. U.S. DOI*, 2023 U.S. Dist. LEXIS 186760, at *9 (citing 40 C.F.R. §§ 1508.9, 1508.11). An EA "[s]hall include brief discussions of the need for the proposal, of alternatives as required by [NEPA] section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." 40 C.F.R. § 1508.9(b). If after conducting an EA, a determination is made that environmental impacts are significant, then an EIS is prepared. 40 C.F.R. § 1508.13. If the EA determines that impacts are not significant, a Finding of No Significant Impact (FONSI) will be prepared in lieu of an EIS. *Id.* A FONSI "shall include the [EA] or a summary of it and shall note any other environmental documents related to it . . . . If the assessment is included, the finding need not repeat any of the discussion in the assessment but may incorporate it by reference." 40 C.F.R. § 1508.13. Here, defendants prepared an EA which culminated in a FONSI, and an EIS was not prepared. Decision r., AR_13694. Agencies must also consider the "cumulative impact" of a proposed project, which may result from "individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7.

Judicial review of agency actions under NEPA is governed by the APA. 5 U.S.C. § 706; *see also San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014). Under the APA, the reviewing court must uphold an agency decision unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Review under the APA is "deferential and narrow, establishing a high threshold for setting aside agency action." *River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1067 (9th Cir. 2010). To demonstrate that a decision is not arbitrary, capricious, or an abuse of discretion, agencies must present a "rational connection between the facts found and the conclusions made." *Oregon Nat. Res. Council Fund v. Brong*, 492 F.3d 1120, 1125 (9th Cir. 2007). On the other hand, an agency's decision is arbitrary and capricious if it is not "based on a consideration of the relevant factors" or if there was a "clear error of judgment." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). A

reviewing court is required to "engage in a substantial inquiry of the agency's action." *Friends of Animals v. U.S. Bureau of Land Mgmt.*, 2015 WL 555980, at *2 (D. Nev. Feb. 11, 2015) (citation omitted).

As they did in their motion for a preliminary injunction, plaintiffs argue that the EA fails to take a "hard look" because it fails to address a number of site and project-specific impacts. I consider each of plaintiffs' arguments in turn.

### a. The EA included site-specific impacts.

Plaintiffs argue that the EA represents that the agency failed to take a "hard look" because it lacks site-specific analysis in several places. First, plaintiffs argue that the EA fails to specify "when, where, or how individual treatments will occur" and it "fails to analyze the impacts of these treatments on the unique 'cognizable environmental values' of the South Spring and Hamlin valleys." ECF No. 25 at 30 (citing *Se. Alaska Conservation Council v. U.S. Forest Serv.*, 443 F. Supp. 3d 995, 1000, 1010 (D. Alaska 2020). In their cross-motion/response, defendants argue that the agency's broad analysis is done within the context of an adaptive management plan. ECF No. 26 at 20. Plaintiffs' argument failed at the preliminary injunction stage and it fails now. Although the EA does say that "any treatment could be implemented in any unit," that statement is made in the context of an adaptive management plan. AR_13713 ("While primary treatments are listed, any treatment could be implemented in any unit as part of adaptive management process.") Adaptive management "is a decision-making process that promotes flexible decision making that can be adjusted in the face of uncertainties as outcomes from management actions and other events become better understood[,]" AR_13812, and is permitted by NEPA. *Protect Our Cmtys. Found. v. Jewell*, 825 F.3d 571, 582 (9th Cir. 2016). The EA states that given the long-term objectives and implementation period of the Project, adaptive management will be utilized to achieve the objectives set forth for a restoration unit when a primary restoration method fails to do so. AR_13182. As I explained in the order denying the motion for a preliminary injunction, "Plaintiffs cannot expect the EA to provide details of how, when, or

where adaptive treatment plans will occur as they are remedies, not planned measures." *W. Watersheds Project v. U.S. DOI*, 2023 U.S. LEXIS 186760, at *15 (citing AR_13813 ("The primary restoration method listed would be the core restoration method conducted; however, secondary restoration methods could be selected in lieu of the primary restoration method if it is determined through monitoring, treatment experience, and site-specific objectives that the secondary restoration methods could better meet project objectives.")). Therefore, this broad context does not defy NEPA.

Next, plaintiffs argue that the EA fails to take a "hard look" because the "Project's design results in a general and vague impacts analysis." ECF No. 25 at 30. To support their argument, plaintiffs point to the EA's "self-evident and uninformative conclusion that the effects on wildlife from the Project could be anything from 'substantial' to 'insignificant' depending on the species, and the location and types of treatments conducted. *Id.* at 30–31 (citing AR_13736-37 and AR_13723-24). Plaintiffs are particularly concerned with the EA's "woefully inadequate" discussion of the pinyon jay. *Id.* at 31. Specifically, plaintiffs take issue with the fact that "the EA does not specify what types of pinyon jay habitats occur in the Project area (nesting, foraging, etc.), where those habitats are located, or the quality of the habitat in the Project area." *Id.* (citing AR_13742-43; AR_13779-83). In their cross-motion/response, defendants argue that a "more granular analysis [is not] warranted for the EA's assessment of impacts on wildlife and special status species." ECF No. 26 at 21. Defendants also explain that plaintiffs' concern about the pinyon jay analysis is unnecessary because "the EA describes the species' general habitat needs in detail and incorporates design features to minimize impacts and ensure that actual conditions are accommodated when treatments occur." *Id.* Specifically, defendants argue:

> The EA explains that pinyon jays "occupy large home ranges and use a variety of woodland habitats for foraging, caching pinon nuts, nesting, and roosting." AR_13741. It then describes where these activities occur, explaining that "[n]est colony sites tend to have somewhat denser tree cover (typically Phase II) than caching sites" and "[r]oost sites are found in relatively high-density stands, usually within ~550 yards of the nesting colony." *Id.* The EA acknowledges the pinyon jay "has experienced significant population declines," *id.*, and vegetation treatments

"could have impacts on woodland obligate species, particularly pinyon jays." AR_13743. Specifically, treatments within traditional nesting colonies "may cause birds to abandon treated areas, . . . alter the suitability of the habitat," or "remove nesting substrate altogether." *Id.*

ECF No. 26 at 21–22. Defendants also argue that "the Project's design features require BLM 'to [c]oordinat[e] with [the Nevada Department of Wildlife] to ensure proper placement and design of treatments that may affect pinyon jay's habitat'" and that the "process 'could include surveying potential nesting sites and avoid[ing] thinning in active nesting areas.'" *Id.* at 22 (citing AR_13808).

I find that, given the size of the project and its long-term nature, the discussion of the pinyon jay is consistent with adaptive management. *Oregon Nat. Desert Ass'n v. Bureau of Land Mgmt.*, 2011 WL 5830435, at *18 (D. Or. Nov. 15, 2011) ("[W]ith a project this size, adaptive management is the only logical way that BLM can proceed to undertake habitat restoration, providing the agency with the flexibility to respond to on-the-ground circumstances when they arise."). I agree that these design features and the description provided of the pinyon jay are consistent with NEPA's requirements. *See Or. Nat. Desert Ass'n.*, 2011 WL 5830435, at *18 (citing *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 417 (D.C. Cir. 2010) ("The procedural requirements of NEPA do not force agencies to make detailed, unchangeable mitigation plans for long-term developed projects.")).

Finally, plaintiffs take issue with BLM's decision to "tier" the EA to several programmatic NEPA documents, instead of undergoing a site-specific analysis of impacts on particular resources. ECF No. 25 at 33. Defendants, however, point out that the Ninth Circuit has expressly disagreed with the argument that tiering to programmatic NEPA documents means that the EA "lacked sufficient site-specific analysis." ECF No. 26 at 28 (citing *W. Watersheds Project v. Ruhs*, 701 F. App'x 651, 653–54 (9th Cir. 2017)). I agree. In *Ruhs*, the Ninth Circuit agreed with the district court's decision declining to find that BLM's decision to tier the EA to other documents resulted in failure to take a "hard look." 701 F. App'x at 653. *Ruhs* is instructive here.

13

As explained in the order denying plaintiffs' motion for the preliminary injunction, "the EA tiers to site-specific analyses and related effects disclosed in eight documents that were subject to NEPA review." *W. Watersheds Project v. U.S. DOI*, 2023 U.S. Dist. LEXIS 186760, at *16. *See* AR_13710-11. Thus, the EA does not violate NEPA for tiering to several documents instead of undergoing site-specific analyses of impacts on particular resources. By insisting I find that it does, plaintiffs are requesting that BLM go above and beyond what is required of under NEPA.

### b. The EA does not minimize negative site-effects on Sagebrush-Obligate wildlife.

The Ninth Circuit has made clear that a "hard look" under NEPA does not improperly minimize any negative side effects. *N. Alaska Envtl. Ctr. v. Kempthorne*, 457 F.3d 969, 975 (9th Cir. 2006). Plaintiffs argue that the EA improperly minimizes negative side effects on the sagebrush-obligate wildlife because it minimizes the "high risk of cheatgrass invasion." ECF No. 25 at 36. According to plaintiffs, cheatgrass invasion is "strongly associated with ground-disturbing activities and fire, and is thus one of the most common and foreseeable adverse site-effects of mechanical and prescribed-fire treatments." *Id.* Indeed, cheatgrass is a serious threat to greater sage-grouse habitat and has already invaded, or is highly likely to invade, the sagebrush and pinyon-juniper communities within the Project *Id.* Plaintiffs argue that despite these developments, BLM fails to mention the threat of the cheatgrass invasion and provides no data or analysis to support the EA's assertion that cheatgrass can be stabilized or suppressed. *Id.* at 37. Plaintiffs argue that the record shows that cheatgrass infestations are not controlled. *Id.* Finally, plaintiffs also argue that BLM does not use appropriate scientific evidence to support its conclusion about sagebrush obligates. *Id.* BLM "relies primarily on a 2017 study by Severson et al. to support its assumption that the Project's impacts on sagebrush species will be overwhelmingly beneficial[.]" *Id.* But the Severson study only looked at one type of treatment: hand cutting, and therefore the Severson study cannot support BLM's broader conclusion that all of its treatment methods will benefit sage-grouse and other sagebrush obligates. *Id.*

In defendants' cross-motion/response, they argue that plaintiffs' critiques "ignore evidence in the record in an attempt to turn policy disagreements into [alleged] NEPA violations." ECF No. 26 at 24–25. Defendants point to several places where the EA and tiered NEPA analysis acknowledge the risk posed by cheatgrass invasion. Defendants state:

> The EA recognizes that "[n]on-native annuals (e.g., cheatgrass) may increase after treatment due to lack of competition from native plants after treatments occur (Kormos et al. 2017)." AR_13730; *see also* AR_12190 (FRRR FEIS) (stating that "soil disturbance" from mechanical treatments "makes a site more susceptible to invasion by undesirable vegetation species"). Despite this risk, BLM concluded that "implementing measures including seeding and chemical treatment of the area could decrease this." AR_13730. The EA further explains that BLM would endeavor to detect weed invasion early and would use targeted grazing and herbicides to control cheatgrass. AR_13805–06. The FRR FEIS states that, "[w]ithout follow-up chemical treatment, the potential for invasive plant cover to increase would be higher (Zouhar 2003), AR_12191, both in the treatment area and in adjacent, untreated areas," and provides more details about follow-up chemical treatments. AR_12147.

ECF No. 26 at 25 (alterations in brief). The AR demonstrates that defendants have adequately acknowledged the risk imposed by cheatgrass. The EA discusses negative impacts of cheatgrass and provides mitigation measures like (1) seeding and chemical treatment of the area and (2) detecting weed invasion early and using targeted grazing and herbicides to control the cheatgrass. *See* AR_13730; AR_13805–06. Further, there is sufficient literature in the record that provides support for using vegetation treatments despite the chance of cheatgrass invasion. *See, e.g.*, AR_00774 (observing that, in an area subject to treatment in 1997, cheatgrass "declined significantly" and "represented only 4% of total standing crop" by 2004); AR_00834 ("By the third year after chaining, the density of [cheatgrass] had declined 85 percent or more compared to the first-year post-treatment values."); AR_05150 (noting that "invasive annual grasses" are the "greatest threat to successful restoration" but "steps can be taken to reduce the risk of invasion in susceptible communities, such as winter and spring burning (Bates and Svejcar, 2009)"). BLM sufficiently complied with NEPA in its discussion of cheatgrass. *See Ruhs*, 701 F.

App'x at 655 (holding that an EA does not violate NEPA when it "discusses potential negative impacts . . . and provides mitigation measures specific to the . . . project").[4]

### c. *The EA sufficiently considers cumulative impacts.*

Lastly, plaintiffs reprise their argument from their motion for preliminary injunction and argue that the EA fails to consider cumulative impacts from livestock grazing. ECF No. 25 at 38. As explained in the order denying the preliminary injunction, "a cumulative impact is 'the impact on the environment which results from the incremental impacts of the action when added to other past, present, and reasonably foreseeable future actions.'" *W. Watersheds Project v. U.S. DOI*, 2023 U.S. Dist. LEXIS 186760, at *21 (quoting *Mont. Wilderness Ass'n. v. Connell*, 725 F.3d 988, 1001 (9th Cir. 2013)). A proper cumulative impact analysis contains quantified or detailed information, but still allows agencies to "characterize the cumulative effects of past actions in the aggregate without enumerating every past project that has affected an area." *Ctr. for Env't L. & Pol'y v. U.S. Bureau of Reclamation*, 655 F.3d 1000, 1007 (9th Cir. 2011). This information can be in the EA itself or can be provided in one of the EA's tiered documents. *Ruhs*, 701 F. App'x at 653–54.

Specifically, plaintiffs argue that the EA fails to consider cumulative impacts from livestock grazing because it only "considers general possible effects of future uses" and because BLM allegedly fail to support its assertions regarding the past and present effects of livestock grazing with quantified data or detailed information. ECF No. 25 at 39–40. In response, defendants argue that plaintiffs' requests go above and beyond what NEPA requires. ECF No. 26 at 28. Defendants argue:

> the EA describes how livestock grazing has negatively impacted the vegetation and wildlife habitat in the Project area and determines that vegetation treatments will help counteract these effects. "Past and present grazing has affected [vegetation]

---

[4] The court also takes no issue with BLM's reliance on the Severson, et al. study. The study does not just look at hand cutting, but also looks at treatments that were machine cut. *See* AR_11136 ("most treatments . . . were conducted . . . by hand-cutting . . . however 444 ha were machine cut"). Further, defendants point out, and plaintiffs seemingly agree, that the Severson study was not the only study relied upon when making decisions involving the sagebrush habitat and cheatgrass. *See* AR_05148–49; AR_05360.

16

> species composition" by contributing to the establishment of pinyon-juniper "in areas that would historically be a sagebrush community" and causing an "increase of noxious and invasive species distribution." AR_13757. The Ely FEIS provides additional details about historical grazing practices and how over-grazing has contributed to current vegetation trends. AR_02171–73; AR_02256. Within the Project area specifically, the EA maps the thirteen different grazing allotments, AR_13786, and describes types of livestock, seasonal use, and animal unit months for each allotment, AR_13751.

ECF No. 26 at 28 (alteration in brief). Defendants also argue that, although plaintiffs "fault BLM's analysis for lacking qualified data about how past grazing contributed to current vegetation conditions and how future grazing could affect the Project's success," *id.*, the Ninth Circuit has held that an agency "may aggregate its cumulative effects analysis . . . with respect to grazing." *Id.* (citing *League of Wilderness Defs.-Blue Mountains Biodiversity Project v. U.S. Forest Serv.*, 549 F.3d 1211, 1216 (9th Cir. 2008). Defendants further argue that the EA does, in fact, consider the impacts of future grazing. *Id.* at 29 (citing AR_13758; AR_13763; AR_13759; AR_13810).

I again find that the EA adequately discusses cumulative effects and contains a cumulative effects analysis. *See* ECF No. 19 at 14 (making same finding); AR_13755–64. The EA itself includes an analysis of the cumulative impacts of livestock grazing, *see* AR_13760–61, and it also tiers to another BLM document that also analyzes cumulative impacts of livestock grazing, AR_13755 (tiering to section 4.28 of the Ely District Record of Decision and Approved Resource Management Plan). As mentioned in my prior order, as an example, the EA addresses the potential cumulative impacts of surface disturbances, such as roads and trails, that may have altered or removed vegetation that would otherwise be available for livestock grazing. ECF No. 19 at 14; AR_13762. The EA also discusses "foreseeable actions within the CESA (Cumulative Effects Study Area) that would affect livestock grazing.". AR_13763. Plaintiffs' arguments in their motion for summary judgment do not change my conclusion that "[t]he Project's analysis of the potential cumulative impact of livestock management generally, and within it livestock grazing, satisfied NEPA's required hard look requirement and created an EA that 'provide[d] a reasonably thorough discussion of the significant aspects of the probable environmental

consequences." *W. Watersheds Project v. United States DOI*, 2023 U.S. Dist. LEXIS 186760, at *22–23 (citing *350 Montana v. Haaland*, 29 F.4th 1158, 1169 (9th Cir. 2022)).

For the reasons outlined above, plaintiffs have failed to demonstrate how the Project violates NEPA. Therefore, summary judgment is granted in favor of defendants on their NEPA claim. As such, summary judgment for plaintiffs' is denied on the NEPA claim.

Because defendants have demonstrated they are entitled to summary judgment on both the FLPMA and NEPA claim, their motion for summary judgment is granted in its entirety. Consequently, I deny plaintiffs' motion for summary judgment.

### IV. Conclusion

IT IS THEREFORE ORDERED that plaintiffs' motion for summary judgment **[ECF No. 25] is DENIED.**

IT IS FURTHER ORDERED that defendants' motion for summary judgment **ECF No. 26] is GRANTED.**

The Clerk of Court is kindly instructed to close this case.

Dated: March 31, 2025

_____
Cristina D. Silva
United States District Judge